Filed 7/1/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PANOCHE ENERGY CENTER, LLC,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>　　　　Defendant and Appellant. | A140000<br><br>(City & County of San Francisco<br>Super. Ct. No. CPF13513060) |

## I.　　INTRODUCTION

This case involves a long-running dispute between Panoche Energy Center, LLC (Panoche), a producer of electricity, and Pacific Gas and Electric Company (PG&E), a utility that purchases electricity from Panoche, over which of them should bear the costs of complying with a legislatively mandated program to reduce greenhouse gas (GHG) emissions pursuant to the Global Warming Solutions Act of 2006 (Assem. Bill No. 32 (2005–2006 Reg. Sess.) (Assem. Bill 32, sometimes referred to as "AB 32").

In an effort to resolve the matter, PG&E invoked the arbitration clause in its power purchase and sale agreement (PPA) with Panoche, seeking an arbitral declaration of Panoche's obligations under the PPA. Panoche resisted the arbitration, moving to dismiss or stay it on grounds the controversy was not ripe for resolution because of ongoing regulatory proceedings at the California Air Resources Board (CARB) and the California Public Utilities Commission (CPUC). These proceedings, Panoche argued, would at least provide guidance in the arbitration and could render the proceeding unnecessary.

The arbitration panel denied Panoche's motion, and after a five-day hearing rendered a decision declaring that Panoche had indeed assumed the cost of implementing AB 32 under the PPA and fully understood this to be the case at the time of signing. In response to a counterclaim for declaratory relief filed by Panoche, the arbitrators also concluded that the parties "provide[ed] for recovery of GHG costs" by Panoche through a "payment mechanism" in Section 4.3 of the PPA.

Panoche filed a petition to vacate the arbitration award under Code of Civil Procedure[1] section 1286.2, subdivision (a)(5), alleging its rights were "substantially prejudiced" by the arbitrators' refusal to "postpone" the hearing "upon sufficient cause being shown" (i.e., until the regulatory proceedings were completed so that the outcome of those proceedings could be considered in the arbitration). PG&E, for its part, requested confirmation of the award under section 1287.4. The trial court agreed with Panoche, ruled that the arbitration had been premature, and vacated the arbitration award.

PG&E now appeals. We shall reverse the court's order vacating the arbitration award and direct that the award be confirmed.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Power Purchase Agreement

PG&E, an investor-owned utility (IOU) regulated by the CPUC, provides gas and electrical service to some 15 million end users in northern and central California. In 2004, with the CPUC's approval, PG&E published a Long Term Request for Offers (LTRFO) for the construction and operation of new electrical generating facilities to help meet anticipated future demands for electricity in northern California. Panoche, a Delaware-based privately-owned energy production company, submitted a proposal to build a 400-megawatt, natural gas-fired electrical production facility in Firebaugh, near Fresno.

---

[1] Statutory references, unless otherwise indicated, are to the Code of Civil Procedure. References to subdivisions without statutory designations are to the subdivisions of section 1286.2.

2

The ensuing negotiations concerning Panoche's proposal culminated in a PPA executed on March 28, 2006, which was approved by the CPUC in November 2006. Under the PPA, PG&E supplies natural gas to the Firebaugh facility, Panoche converts that gas into electricity, and PG&E purchases the electricity under a 20-year "tolling agreement" for a "peaking plant," meaning that PG&E dictates when the facility will be operated and how much electricity will be generated, and the plant runs only when PG&E's power needs are especially high and it needs extra power on its grid to ensure consistent power supply.

## B.  AB 32: The Global Warming Solutions Act of 2006

While the PPA was being negotiated, proposed legislation aimed at addressing climate change through the regulation of GHG emissions came before the California Legislature.  As introduced in December 2004, AB 32 dealt primarily with carbon emissions recordkeeping, reporting and protocols.  It did not require electricity generators such as Panoche to bear any costs associated with reducing GHG emissions. But AB 32 went through several amendments before it was finally passed at the end of August 2006, and as the bill progressed through the legislative process, it focused increasingly on reduction of GHG emissions.

The Legislature was not alone in moving on this issue.  In June 2005, Governor Schwarzenegger issued an Executive Order directing the California Environmental Protection Agency (CEPA) to coordinate the efforts of various state agencies to reduce California GHG emissions by certain target amounts between 2010 and 2050. (Governor's Exec. Order No. S–3–05 (June 1, 2005) at <https://www.gov.ca.gov/news.php?id=1861> [as of July 1, 2016].)  Specifically, the Governor called for reduction of GHG emissions to 1990 levels by 2020 and to 80 percent below 1990 levels by 2050.  (*Ibid.*)

On August 15, 2005, an amendment to AB 32 was introduced, including The California Climate Act of 2006, which would have required the CEPA "to institute a cap on greenhouse gas emissions" from, among other sectors, the electrical power industry.

3

(Legis. Counsel's Digest, Assem. Bill 32, as amended Aug. 15, 2005, & introducing proposed Health & Saf. Code § 42877, subd. (a)(2) & (3), at <http://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200520060AB32> [as of July 1, 2016].) The intent of the proposed amendments was to require the CEPA to "institute a schedule of emissions reductions for specified entities, develop an enforcement mechanism for reducing greenhouse gas emissions to the target level, and establish a program to track and report greenhouse gas emissions and to monitor and enforce compliance with the greenhouse gas emissions cap" by January 1, 2008. (*Ibid*.) Although this amendment did not become part of the law as finally adopted, its pendency was no doubt on the radar screens of market participants in the energy field in California.

By April 18, 2006, approximately three weeks after the PPA was signed, the Legislative Counsel's Digest for the version of AB 32 then under consideration summarized the proposed legislation as follows: "The bill would require the state board to adopt regulations, on or before January 1, 2008, to reduce statewide greenhouse gas emissions to 1990 emission levels by 2020 . . . ." (Legis. Counsel's Digest, Assem. Bill 32, as amended Apr. 18, 2006.) That iteration of the bill also included a requirement that the CARB adopt regulations to, among other things, "[d]istribute the costs and benefits of the program, including emission allowances, in a manner that is equitable, maximizes the total benefit to the economy, does not disproportionately burden low- and moderate-income households, provides compliance flexibility where appropriate, and ensures that entities that have voluntarily reduced their emissions receive appropriate consideration for emissions reductions made prior to the implementation of this program." (Legis. Counsel's Digest, Assem. Bill 32, as amended April 18, 2006, proposed amends. to Health & Saf. Code § 42877, subd. (c)(1).) Again, though the quoted language was not ultimately included in AB 32 as passed, it presumably constituted a red flag to participants in energy production indicating that costs would be entailed in implementing AB 32 if it did ultimately pass.

4

By June 2006, although the term "cap-and-trade" had not yet come into common use, AB 32 had further evolved and began to include the concept of "allowances"―defined as "authorization[s] to emit, during a specified year, up to one ton of carbon dioxide equivalence"―and "[f]lexible compliance mechanisms" that would allow GHG emitters to "bank[], borrow[], and [use other] market mechanisms that provide compliance flexibility to entities that are required to ensure that their greenhouse gas emissions do not exceed their emissions allowances."[2] (Assem. Bill 32. as amended June 22, 2006, proposed amends. to Health & Saf. Code § 42876, subds. (a) & (g).)

After further amendment in late August 2006, AB 32 was signed into law in September 2006 as the California Global Warming Solutions Act of 2006, some six months after the PPA was signed, and was codified as Health and Safety Code sections 38500–38599, effective January 1, 2007. (See Stats. 2006, ch. 488, § 1.) As initially adopted, however, the legislation did not pinpoint how emissions were to be reduced or who was to pay associated costs. Those questions were left to CARB to answer.

## C. Impact of the Pending Legislation on PPA Negotiations

According to PG&E, during the PPA negotiations the negotiators on both sides were aware of developments in the GHG legislation as it progressed through the Legislature, and they all understood it could have significant financial and other impacts on future energy production in California. PG&E claims that under a "change in law" provision in the draft PPA, a clause it insisted upon in all of its power purchase agreements at the time, both parties fully understood Panoche would be responsible for

---

[2] The legislative analysis discussed the prospect of "trading" of allowances: "The bill, as amended, strongly appears to lay the foundations for market mechanisms, including potentially trading. The adoption of regulations to limit GHGs, for example, is explicitly based on banking, borrowing, and market mechanisms. The same regulations also include the 'distribution of emissions allowances,' or authorizations to emit a [*sic*] GHGs." (Sen. Com. On Environmental Quality, Analysis of Assem. Bill 32 (2005–2006 Reg. Sess.) as amended June 22, 2006, p. 8, at < http://www.leginfo.ca.gov/pub/05-06/bill/asm/ab_0001-0050/ab_32_cfa_20060626_101302_sen_comm.html> [as of July 1, 2016][2005 Legis. Bill Hist. CA A.B. 32 (June 26, 2006)].)

any costs associated with the pending GHG legislation, and indeed the PPA negotiators specifically discussed the fact that this clause covered potential GHG compliance costs, even though the legislation had not yet progressed to the point where those costs could be quantified.

Panoche, on the other hand, claims to have been blindsided by AB 32. Panoche argues it was not foreseeable to energy producers until at least June 2006 that AB 32 costs could become a major concern. The "change in law" provision, it argues, was just a "generic" clause that made no specific reference to AB 32 or GHG costs and therefore did not apply to such costs; allocation of such costs was "never part of the parties' deal." Because such costs were not quantifiable when it signed the PPA, Panoche asserts it "would never have signed" if it had understood it would be on the hook for unknown and unquantifiable future costs.

PG&E supports its position by pointing out that on December 16, 2004, eight days after AB 32 was introduced in the Assembly and fifteen months before the PPA was signed, the CPUC issued a Long Term Plan Decision in which it insisted, for the first time, that PG&E and certain other utilities then in the process of negotiating power purchase agreements take into account the cost of GHG emissions in evaluating bids under the LTRFO. "To further the state's clear goal of promoting environmentally responsible energy generation, [the CPUC] also adopt[s] a policy that reflects and attempts to mitigate the impact of GHG emissions in influencing global climate patterns. As described in this decision, the IOUs are to employ a 'GHG adder' when evaluating fossil and renewable generation bids. This method, which will be refined in future proceedings, will serve to internalize the significant and under-recognized cost of GHG emissions, help protect customers from the financial risk of future climate regulation, and continue California's leadership in addressing this important problem." (*Opinion Adopting PG&E's Long Term Procurement Plan* (Dec. 16, 2004) Cal.P.U.C. Dec. No. 04-12-048 [2004 Cal.P.U.C. Lexis 598, pp. *15–*16.])

6

In response to the CPUC's Long Term Plan Decision, PG&E updated its LTRFO to require bidders on new electrical generating facility projects to accept liability for changes in the law, and it specifically assessed applicants' bids in part on their willingness to assume financial responsibility for what PG&E deemed to be foreseeable changes in the law. In March 2005, PG&E reissued the LTRFO, requiring that all counterparties getting contract positions would have to take on the risk of future changes in the law,[3] specifically insisting on adherence to a "change in law" provision that cast upon PG&E's counterparty in each contract the obligation to assume the risk of associated costs.[4]

Aside from the evidence of the negotiations surrounding the amended LTRFO, PG&E argues that at least as of the time of the August 2005 amendments to AB 32, more than seven months before the PPA was signed, those following the progress of AB 32 were aware that (1) GHG emissions would have to be reduced over time, (2) there would be a regulatory "cap" on such emissions, and (3) some "enforcement mechanism" would be used to ensure compliance. To a sophisticated participant in energy production such as Panoche, PG&E argues, all of this clearly signaled that the passage of AB 32 would entail a significant new cost burden of GHG emissions reduction compliance.

---

[3] According to PG&E, its amended LTRFO led to the inclusion in the PPA of Section 3.6 "Standards of Care," subsection (a) "General Operations": "Seller [Panoche] shall comply with all applicable requirements of Law . . . relating to the Facility [including those related to operation of the Facility and the sale of Product therefrom]. For the avoidance of doubt, Seller will be responsible for procuring and maintaining, at its expense, all Governmental Approvals and emissions credits required for operation of the Units throughout the Service Term in compliance with Law and to permit operation as specified in Section 11.3(a)(v). Buyer [PG&E] shall cooperate with Seller's efforts to acquire all such Governmental Approvals."

[4] When another new power plant bidder objected to incorporating the changes PG&E demanded, PG&E stopped negotiating with that bidder. Thus, it may be inferred that PG&E would not have entered into the contract with Panoche had it understood that Panoche would later seek regulatory "relief" from costs it had agreed to assume, at least not if it meant shifting those costs to PG&E.

PG&E claims its view of what sophisticated parties would have known is more than a matter of revisionist history. It points out the CPUC has taken that view as well, opining in a 2012 settlement approval decision that "contracts negotiated and executed when AB 32 was working its way through the legislature should have taken the potential impacts of AB 32 into consideration. Even those negotiating contracts shortly before then might also have reasonably foreseen that this issue could arise." (*Decision on System Track I and Rules Track III of the Long-Term Procurement Plan Proceeding and Approving Settlement* (Apr. 19, 2012) Cal.P.U.C. Dec. No. 12-04-046 [2012 Cal.P.U.C. Lexis 192, at p. *93].) And in another 2012 decision, PG&E points out, the CPUC specifically identified the August 15, 2005 amendments as being a significant indicator that GHG costs should be considered in negotiating power purchase agreements. (*Decision Granting Petition for Modification of Decision 04-06-011 Regarding Otay Mesa Energy Center* (Dec. 20, 2012) Cal.P.U.C. Dec. No. 12-12-002 [2012 Cal.P.U.C. Lexis 563, at pp. *13–*14].)

## D. The Regulatory Proceedings and the Cap-and-Trade Program

As noted, the Legislature largely delegated to the CARB the task of determining how best to implement the broad goal of reducing GHG emissions. (Health & Saf. Code, § 38501, subds. (f)–(h).) The CARB held public hearings to assist in formulating a plan for implementing AB 32, and in June 2008, the CARB released a draft scoping plan that included a proposed "cap-and-trade" program for the first time. (CARB Climate Change Draft Scoping Plan (June 2008) Executive Summary, pp. ES-1–ES-9 at <http://www.arb.ca.gov/cc/scopingplan/document/draftscopingplan.htm> [as of July 1, 2016].)

After much consideration, on October 26, 2011, the CARB adopted final rules for a GHG cap-and-trade program, which became effective January 1, 2012. (See "California Cap on Greenhouse Gas Emissions and Market Based Compliance Mechanisms," Cal. Code Regs., tit. 17, art. 5, § 95801 et seq.) Under that program, utilities are granted free of charge emissions permits (called "allowances"), each

authorizing the emission of one metric ton of GHG. (Cal. Code Regs., tit. 17, §§ 95820, subds. (a) & (c), 95892.) The utilities must then surrender their allowances to CARB, which in turn sells allowances to emissions generators, such as Panoche, in periodic auctions. (Cal. Code Regs., tit. 17, § 95910.) Allowances may be bought, banked, or sold. (*Id.*, §§ 95910, 95920, 95922; *Our Children's Earth Foundation v. State Air Resources Board* (2015) 234 Cal.App.4th 870, 877.) Energy producers must acquire, through quarterly auctions, sufficient allowances to cover the amount of their GHG emissions.

For Panoche, continued operation of its power plant requires procurement of allowances, which will become increasingly expensive over time. The theory underlying cap-and-trade is that, as time goes by, fewer allowances will be issued, thereby raising the price of allowances and creating a financial incentive for energy generators to find ways to reduce GHG emissions. Reducing public consumption is also a component of the emissions reduction plan, so the CARB also wanted to send a "price signal" to consumers. As the details of the program came into sharper focus, both the CARB and the CPUC received specific input from stakeholders about who should bear the cost of allowances (i.e., emissions generators or utilities, which could pass the cost on to the ultimate consumers through their approved rates).

Panoche claims the CARB made a policy determination that the ultimate consumer should bear the costs of GHG regulation on the theory that increased cost to the consumer would lead to reduced consumption and thus to curtailed GHG emissions. The CARB's Final Statement of Reasons (FSOR) adopting the cap-and-trade program, dated October 2011, does say: "A primary goal of the program is to create a price signal to reduce greenhouse gas emissions." (CARB, FSOR for California's Cap-and-Trade Program (Oct. 2011) Response to Comment I-49, p. 592, at <http://www.arb.ca.gov/regact/2010/capandtrade10/capandtrade10.htm> [as of July 1, 2016].) With respect to GHG compliance costs generally, the CPUC also expressed a policy preference that utilities pay the costs of GHG compliance and compensate

9

generators for those costs, including through modifications to power purchase agreements if necessary.

### E. "Legacy Contracts"

Once cap-and-trade was in place, both the CARB and the CPUC showed some sensitivity to the plight of energy producers whose contracts had been negotiated before AB 32 went into effect, since those producers could be subjected to unexpected and unforeseeable costs associated with the cap-and-trade program. To the extent such costs were not considered in negotiating these antecedent contracts, the costs of cap-and-trade were likely to be "stranded" with these producers. Such contracts became known as "legacy contracts." The regulatory definition of that term—and whether the PPA in this case qualifies as a legacy contract—became a matter of intense dispute between Panoche and PG&E.

Both Panoche and PG&E participated in the CPUC and CARB proceedings to implement the cap-and-trade regulation, advocating opposite viewpoints. While Panoche favored imposing GHG compliance costs on the utilities and passing on the cost to consumers, PG&E advocated making the energy producers pay for allowances if they had contracted to do so. Panoche emphasized that its point of view best aligned with the intent of AB 32 since putting compliance costs on utilities would send a "price signal" to consumers and thereby reduce consumption, but PG&E's theory was that where power purchase contracts are negotiated with anticipated GHG costs built into the price term, then the utility's ratepayers had already been paying those costs and should not be charged twice.

With respect to Panoche in particular, PG&E told the regulators that Panoche had undertaken in the PPA to pay for costs related to AB 32 and this was a "key issue in the parties' negotiations." Panoche told them the opposite: "The issue of GHG compliance cost responsibility is not addressed in the PPA, the CPUC testimony or exhibits, nor is there any allegation that [Panoche] would bear such potential costs in the CPUC public record." "Furthermore, the . . . PPA does not include a change in law provision."

10

Panoche even went so far as to say that "PG&E stated it was too early in the legislative process to address [GHG legislation] in the contract and withdrew the issue from consideration." Panoche further suggested to the CPUC it would be financially crippled and might be forced to discontinue operations if required to foot the whole bill for compliance with AB 32. Panoche also opined that imposing AB 32's GHG costs on energy generators might well be considered an unconstitutional "taking" or and "unlawful tax."

In April 2012, the CPUC ordered utilities such as PG&E to renegotiate within 60 days any contracts entered before AB 32's effective date that "do not address the allocation of AB 32 compliance costs," so that they would "be consistent with [the CPUC] policy," including revisiting if necessary "questions of whether the existing contract may have taken the passage of AB 32 into consideration."[5] (*Decision on System Track I and Rules Track III of the Long-Term Procurement Plan, supra,* 2012 Cal.P.U.C. Lexis 192, at p. *94.) Panoche claims the CPUC was concerned with the fair treatment of independent energy producers, quoting the statement that it "appears somewhat arbitrary and unfair for the recovery of greenhouse gas compliance costs to vary between otherwise similarly-situated generators based on whether the applicable contract was signed before or after the passage of AB 32."[6] (*Id.* at p. *93.) At the same time, the

---

[5] PG&E informs us that it has successfully renegotiated all such contracts except its PPA with Panoche.

[6] The full quote suggests the CPUC was concerned with fairness to all participants, not just energy producers: "As a general matter, the independent generators are correct that it appears somewhat arbitrary and unfair for the recovery of greenhouse gas compliance costs to vary between otherwise similarly-situated generators based on whether the applicable contract was signed before or after the passage of AB 32. *At the same time, contracts negotiated and executed when AB 32 was working its way through the legislature should have taken the potential impacts of AB 32 into consideration. Even those negotiating contracts shortly before then might also have reasonably foreseen that this issue could arise.*

"In D.08-10-037, we emphasized the importance of treating all market participants equitably and fairly, and reiterated our statement in D.08-03-018 that, '[I]t is not our

11

CPUC made clear it was not interested in "bailing . . . out" energy producers who had simply made an error in business judgment during contract negotiations. (See fn. 6, *ante*.)

Beginning in June 2012, Panoche and PG&E exchanged correspondence in which both claimed they had attempted to renegotiate their dispute, each blaming the other for failure of the negotiations. Nearing the end of the 60-day period specified in the CPUC's renegotiation order, PG&E requested an extension. The Executive Director of the CPUC replied in a letter dated June 20, 2012, that the 60-day period indicated in the renegotiation order was not intended to impose a deadline: "The [CPUC] has a strong preference that contract disputes be addressed by the signatories to the contract given that such parties have the most in-depth knowledge of the contract itself and their own operations." The letter advised PG&E that it "may and should continue to negotiate bilaterally," although the CPUC did not intend to allow the issue to "languish indefinitely." The impasse in renegotiation ultimately led to PG&E's filing of a request for arbitration some four or five months later.

Meanwhile, after expiration of the 60-day renegotiation period, Panoche sought and was granted party status in the CPUC rulemaking proceeding (*Administrative Law Judge's Ruling Confirming Party Status,* Cal.P.U.C. R. 11-03-012 (July 9, 2012) <http://www.cpuc.ca.gov>) in early July 2012 and also successfully moved to enlarge the scope of the CPUC proceeding to consider which party should bear responsibility for GHG compliance costs in legacy contracts. At this point the dispute between the parties intensified because, according to PG&E, Panoche had misrepresented to the regulators

---

intent to treat any market participants unfairly based on their past investments or decisions made prior to the passage of AB 32.' (D.08-10-037 at 144–145, citing D.08-03-018 at 18.) While we do not need to treat everyone identically, and *we are not in the business of bailing unregulated market participants out from their own past missteps*, this fundamental concept still holds true: we do not want to inadvertently create or maintain unfair competitive impacts." (*Decision on System Track I and Rules Track III of the Long-Term Procurement Plan, supra*, 2012 Cal.P.U.C. Lexis 192, at pp. *93–*94, italics added.)

12

the contractual provisions of the PPA. PG&E suggested Panoche cannot rightly be considered a party to a "legacy contract" at all and is not being saddled with costs "stranded" by the PPA. Instead, according to PG&E, Panoche negotiated and entered into the PPA with its eyes wide open to the potential costs associated with GHG emissions, and yet was trying to evade the bargained-for costs that it agreed to bear and, at least at that point in the dispute, was attempting to shift those costs to PG&E and its ratepayers.

Panoche's version of events, not surprisingly, was sharply different. It told the CPUC on July 3, 2012: "The PPA does not address GHG compliance cost responsibility and does not compensate [Panoche] for the costs of obtaining GHG allowances . . . ." In a separate filing the same date, Panoche elaborated: "The [Panoche] PPA includes no provision that can be reasonably read to assign GHG cost responsibility to [Panoche]. . . . PG&E's position that [Panoche] assumed responsibility for GHG compliance costs and priced this cost into the price of energy in the PPA is not only completely unsupported by any provision in the PPA but also contrary to common sense. [Panoche] could not have priced GHG compliance costs into the PPA because GHG compliance costs were speculative and unquantifiable at the time the PPA was executed."

In August 2012, two CPUC Administrative Law Judges (ALJs) issued proposed criteria for determining whether parties to legacy contracts could obtain financial relief, which came to be known as "transition assistance" to the new cap-and-trade regime. The CPUC requested comment on the following proposed "Eligibility Guidelines": "We propose for comment that a contract between a generator and a utility must meet the following criteria in order to be eligible to receive relief, should the Commission decide relief is warranted, in this proceeding: [¶] 1. The contract must have been executed prior to the effective date of AB 32 (January 1, 2007); [¶] 2. The contract must not have been subsequently amended; [¶] 3. The contract does not provide for recovery of GHG costs, either explicitly or by virtue of a payment mechanism, . . . ; and, [¶] 4. The contract does not expire before the start of the first cap-and-trade compliance period (i.e., January 1,

13

2013)." (*Administrative Law Judges' Ruling Setting Forth Next Steps in Track 1 Phase 2 of this Proceeding,* Cal.P.U.C. R. 11-03-012 (Aug. 7, 2012) <http://www.cpuc.ca.gov>.) The purpose of the proposal was to "set boundaries on the world of contracts that may be eligible for compensation." Compensation was not guaranteed by the establishment of these criteria, and no final resolution of the issue of stranded GHG costs was achieved. But at the time PG&E initiated arbitration some two or three months later, this pronouncement from the CPUC ALJs was the most recent regulatory iteration of the definition of a "legacy contract."

Later in August 2012, Panoche submitted comments on the proposed criteria. First, Panoche urged the CPUC to adopt a bright-line rule granting transitional relief to all independent energy producers who entered into power purchase and sale agreements with utilities "executed prior to the . . . effective date" of AB 32, arguing this should be the "sole necessary criterion" for such relief. Second, Panoche suggested the CPUC "may wish to avoid establishing criteria that will require the [CPUC] to review and interpret individual contracts." And third, Panoche suggested the CPUC should "provide relief for any generator providing service under a legacy PPA that does not include an *express and explicit* provision imposing GHG emissions reduction program costs . . . on the seller. Mere reference to GHG reporting, environmental attributes, or Clean Air Act emissions reductions credits in the PPA should not be construed as addressing GHG compliance costs nor should any implicit assumptions be the basis for denying relief to the generator." (Italics in original.) It appears, therefore, that Panoche was maneuvering in the regulatory proceedings to make sure its own PPA with PG&E would fit within the regulatory definition of a "legacy contract," with the hope that it would then be deemed entitled to transition assistance.

PG&E's comments on the proposed definition of "legacy contracts," likewise, reflected the position it had been taking for years on who ought to bear the burden of AB 32 GHG compliance costs. PG&E opposed inclusion in the eligibility criteria of any requirement that the contract "explicitly" or "specifically" allocate costs to the energy

14

producers. (Pacific Gas And Electric Company's (U 39 E) Comments On Administrative Law Judge's Ruling On Track 1 Phase 2 Issues, p. 3 <http://www.cpuc.ca.gov>.) PG&E also proposed that if contracts were modified to shift GHG costs to PG&E, the energy producers should be required to accept in return certain contractual modifications "to ensure that PG&E's customers are compensated for accepting GHG compliance cost responsibility for these sellers." It further recommended the "use of contractual dispute resolution processes to resolve disputes over" individuals contracts. (*Ibid.*)

Complicating the picture, in the fall of 2012 the CARB turned its attention to legacy contracts as well, which meant that regulatory proceedings on that issue were taking place before two different agencies. On September 20, 2012, the CARB issued a resolution stating its intention to develop a methodology to provide transition assistance to energy producers with a compliance obligation cost under the cap-and-trade regulation that could not be "reasonably recovered due to a legacy contract." (CARB Resolution 12–33 (Sept. 20, 2012), p. 3 <http://www.arb.ca.gov>.) Although the CARB would ultimately take the lead in propounding regulations to deal with legacy contracts, at the time of the arbitration the most recent attempt to establish a working definition was the August 2012 definition by the CPUC ALJs.

## F. The Arbitration

### 1. *The initiation of the arbitration*

Negotiation and mediation having failed,[7] on November 8, 2012, PG&E initiated arbitration in accordance with the dispute resolution provisions of the PPA. A panel of

---

[7] In June 2012, PG&E, under order by the CPUC to renegotiate its contract with Panoche, wrote to Panoche, seeking negotiation or mediation of the dispute about the obligations Panoche had assumed under the PPA. This triggered the PPA's dispute resolution provision, which required negotiation and mediation as precursors to arbitration. Panoche responded that its efforts at negotiation had been "utterly fruitless" and expressed its unwillingness to meet further. A similar request for mediation by PG&E was rebuffed by Panoche in September 2012, with Panoche contending the matter was not "ripe for mediation or arbitration."

three arbitrators was convened to hear the dispute: Judge W. Scott Snowden, retired; Judge Richard M. Silver, retired; and attorney Martin Quinn.

PG&E sought a declaration that the PPA (1) "addresses GHG compliance costs" and "assigns responsibility for those costs to Panoche," and (2) "at the time the PPA was signed, Panoche understood that, under the PPA, if there was a future change in law that imposed a cost on the facility because of its GHG emissions, Panoche would be responsible for paying that cost." PG&E sought a definitive interpretation of the PPA in the hope of convincing the regulators that Panoche should not be entitled to "legacy contract" status or to transitional relief.

Panoche filed a counterclaim for declaratory relief that (1) the PPA does not "provide for recovery of GHG costs, either explicitly or by virtue of a payment mechanism" (based on the language of the CPUC ALJs' August 2012 proposed eligibility criteria); and (2) "under section 3.1(b) of the PPA, [Panoche is not] required to bear AB 32 GHG compliance costs that exceed an annual average of the greater of $100,000 per year or $.50 per kW year."

2. *Panoche's motion to dismiss or stay the arbitration*

On January 15, 2013, Panoche filed a motion to dismiss or stay the arbitration pending further proceedings by the CARB and the CPUC. It argued PG&E's declaratory relief claim was not "ripe" because of the pending regulatory proceedings. In Panoche's view, the real dispute between the parties was in relation to how the regulatory bodies would allocate costs for allowances. According to Panoche's theory, the action taken by the CARB and the CPUC would trump any contractual provision related to allocation of costs, and it was a waste of time and resources to arbitrate the contractual issues before the regulatory bodies had adopted a definite policy governing legacy contracts. Without the expected regulatory rules or criteria—rules or criteria that the CPUC and/or the CARB anticipated would issue by the end of August 2013—Panoche contended that it was impossible for the arbitration panel to reach a decision that would dispose of the controversy between Panoche and PG&E over GHG costs. The sole basis Panoche gave

16

for requesting a stay or dismissal was the claim of unripeness.

PG&E argued the arbitration concerned a simple matter of contract interpretation based on an analysis of the PPA's terms and the course of negotiations that occurred in 2005 and 2006. According to PG&E, this was not the same broad policy issue relating to overall GHG cost allocation that the CARB and the CPUC were considering, and the regulatory bodies had no intention of delving into the details of individual PPAs. Moreover, PG&E claimed, the CPUC had directed PG&E to attempt to renegotiate its PPA with Panoche, which included the question whether "the existing contract may have taken the passage of AB 32 into consideration." (*Decision on System Track I and Rules Track III of the Long-Term Procurement Plan*, *supra,* 2012 Cal.P.U.C. Lexis 192, at p. *94.) And, of course, PG&E argued that an arbitration award settling the parties' contractual dispute would not be simply an "advisory" opinion, but rather would be useful to the regulators in determining public policy.

The arbitrators found the dispute was ripe for adjudication and denied Panoche's motion. They reasoned: "Panoche has failed to demonstrate how proceeding with this arbitration would either replicate, interfere or conflict with, or provide an advisory opinion to the ongoing CPUC and CARB proceedings. Indeed, by Panoche's own admission, these public agencies are merely deciding how to handle power purchase agreements that were executed prior to AB 32 that lack terms and conditions specifically designating responsibility for GHG costs. . . . They are *not* deciding whether any individual contracts, such as the parties' PPA, actually lacked such terms and conditions—the sole and exact issue before the Panel here. [¶] Thus, because PG&E has presented a real controversy that is appropriate for immediate judicial resolution because it concerns an issue that will not be resolved by either of the public agencies, this contractually-agreed-to forum is the appropriate venue for the parties to resolve their claims." After significant discovery was conducted, a five-day arbitration was held in April 2013.

17

### 3. *The arbitrators' decision on the merits*

On May 2, 2013, the panel reached its decision, ruling in favor of PG&E. As quoted above, the PPA included Section 3.6(a), a change in law provision, under which PG&E claimed the costs of compliance with AB 32 had been assumed by Panoche. (See fn. 3, *ante*.) That provision required Panoche to "comply with all applicable requirements of Law . . . relating to the Facility" and to "be responsible for procuring and maintaining, at its expense, all Governmental Approvals and emissions credits required for operation of the Units throughout the Service Term . . . ." "Law" was also defined in the PPA to include a "statute, law, . . . [or] enactment," including one "enacted, amended, or issued after the Execution Date [of the PPA] and which becomes effective during the Contract term," and it also included "regulation[s]." Thus, the arbitrators ruled that both AB 32 and the CARB's cap-and-trade regulations were part of the "Law," as defined in the PPA, and by committing to comply with "Law" within the meaning of the PPA, Panoche had contractually agreed to bear the costs of compliance. The arbitrators specifically concluded that "[o]ne such 'Law'—the cap-and-trade regulations—requires entities such as Panoche to pay for and acquire sufficient GHG allowances to cover their carbon emissions. Panoche, therefore, agreed to comply with this requirement of the cap-and-trade regulations."

Both the term "Law" and the term "Governmental Approval" as used in the PPA were also defined to include an "authorization." Because an "allowance" is defined by statute as "an authorization to emit, during a specified year, up to one ton of carbon dioxide equivalent" (Health & Saf. Code, § 38505, subd. (a)), the emission allowances required under AB 32 and its implementing regulations constituted "Governmental Approvals" within the meaning of the PPA, and "Panoche, therefore, contractually agreed to procure AB 32 allowances at its expense." Despite the fact that GHG emissions were never mentioned by name in the PPA, the arbitrators concluded the PPA's "change in law" provision required Panoche to assume the costs of GHG compliance.

The arbitrators found support for this conclusion in the testimony of Panoche's lead negotiator, Keith Derman, one of Panoche's key witnesses in the arbitration. Derman was a partner at Energy Investors Funds (EIF), a private equity fund based in Boston, Massachusetts, that owns the Firebaugh plant. He admitted in a deposition that he understood when the PPA was signed that the "four corners of the contract" made Panoche responsible for the costs "if a government law changed and imposed a cost on Panoche relating to the facility's carbon emissions." His follow-up observation that "there was no specific language in the agreement to deal with greenhouse gases" struck the arbitrators as "unpersuasive."

As further support for their decision, the arbitrators noted that during contract negotiations, in response to PG&E's proposed "change in law" amendments, Panoche suggested that it should receive higher compensation in the event of a change in the law that imposed higher costs of performance on Panoche, but this change was never incorporated into later revisions. Panoche also proposed that both parties share responsibility for compliance with all applicable requirements of law; that the PPA should eliminate the language specifying that Panoche would have to pay for all "Governmental Approvals"; that Panoche could not be declared in default if it was unable to (or simply failed to) obtain necessary Governmental Approvals; that the PPA should eliminate the requirement that Panoche obtain all needed "emissions credits"; and that the Force Majeure clause should be modified to include Panoche's "inability to obtain and maintain any governmental Approvals required . . . ." The markups of the PPA also show a note by Panoche requesting that the parties "[d]iscuss change in law issues."

PG&E also sent a letter to Panoche explaining that Panoche's proposed changes to the amended PPA "would make major changes to the benefits and burdens of PG&E's form PPA, significantly affecting the value of your Final Offers to PG&E." PG&E insisted that Panoche's offer "needs improvement in order to be further considered." Despite Panoche's early resistance to the changes, negotiations continued and Panoche

19

eventually accepted PG&E's proposed amendments to the PPA so that Section 3.6(a) now reads as quoted in footnote 3, *ante*.

Documents generated by Panoche outside of the direct negotiations confirmed Panoche's contemporaneous understanding that it bore the risk of costs to comply with future GHG legislation. For instance, in a memorandum in March 2006 (before the PPA was signed), Derman advised EIF's investment committee of the benefits and risks of the Panoche project, noting as a risk that "there is remaining fear that [California] is monitoring carbon emissions" and that there was "no current mitigation in place" to address this risk. He testified in his deposition it was "true" that he understood that "California might impose a cost on carbon emissions." The arbitrators found Derman's admissions "telling" in reaching their conclusions.

EIF also issued a bond offering memorandum some two years after the PPA was signed (but before the present dispute arose), which discussed AB 32, including that its "regulatory program may include a trading market for greenhouse gas emissions credits" and "the Facility [in Firebaugh] . . . likely will be required to comply with these AB 32 regulations" and "likely . . . will participate in the greenhouse gas emissions credit market, and will be required to make certain expenditures from time to time to purchase such credits." The arbitrators also considered this document to be "proof of Panoche's understanding and consideration of the impact that AB 32 could have on the [Firebaugh] Facility and its bottom line . . . ."

Panoche argued that it would never have accepted the cost risk associated with GHG emissions because it would have viewed this risk as too "unknown, unlimited, unquantifiable." The arbitrators, however, found "overwhelming evidence" to the contrary. The arbitrators tracked the drafting changes proposed to the PPA during negotiations, which (as outlined above) showed that Panoche had initially resisted taking responsibility for costs of implementing AB 32, but eventually agreed.

After weighing the evidence bearing on the parties' contracting intent, the arbitration panel found "clearly, Panoche was aware that it would be responsible for

paying the cost of any change in law that imposed a cost on the Plant because of its GHG emission." The arbitrators concluded Panoche's failure to raise its price for electricity after PG&E insisted on the "change in law" provision reflected its "own evaluation of the risks"—which some of its witnesses considered "minimal"—rather than any misunderstanding that it was assuming the cost of changes in the law. Though they did not use the term "business judgment," the arbitrators found in essence that Panoche appreciated the risk involved in its decision not to raise the price of electricity in its bid after being forewarned by PG&E that it would be required to cover AB 32 compliance costs. Evidently, though, Panoche wanted to be awarded the contract with PG&E badly enough that it took a gamble that those risks would not prove too onerous. The arbitrators found that the contract price in the PPA took into account the costs associated with AB 32's impending GHG regime. And the panel concluded there is no danger that Panoche will lose money on the contract, specifically finding that "Panoche's projected profit margins were of such a substantial size . . . that there was still ample room for profit even with GHG compliance costs being considered."

In light of their findings, the arbitrators granted PG&E's request for declaratory relief on both of its issues, as follows: (1) "It is hereby declared that the PPA addresses greenhouse gas emissions . . . compliance costs and assigns responsibility for those costs to Panoche" and (2) "It is hereby declared that at the time the PPA was signed, Panoche understood that, under the PPA, if there was a future change in the law that imposed a cost on the facility because of its GHG emissions, Panoche would be responsible for paying that cost." The arbitrators emphasized they were "not rendering an advisory decision on an issue of great policy importance," but rather were concerned solely with "contract interpretation" and "what, exactly, the [p]arties understood."

With respect to Panoche's first counterclaim for declaratory relief, the panel was not swayed by the fact that the PPA does not specifically mention cost recovery for AB 32 allowances or GHG emissions by name and found that fact was "not dispositive." The arbitrators found there was a "payment mechanism" in place under the PPA that allowed

21

Panoche to recover GHG costs in that PG&E was required under Section 4.3 of the PPA to make "full payment" for the electrical power produced by Panoche, in accordance with formulas set forth in the PPA. The arbitrators therefore denied Panoche's first counterclaim for declaratory relief. Panoche's second counterclaim for declaratory relief sought to establish limits on Panoche's liability for GHG costs based on Section 3.1 of the PPA, which covered "Resource Adequacy Requirement." The arbitrators found that section inapplicable to GHG costs and denied the requested relief. Finally, the arbitrators postponed decision on attorney fees and costs under the PPA, Section 12.4(c).

Eight days after the arbitrators' decision, PG&E advised the CPUC of the arbitrators' decision, apparently sending it a copy of the arbitration award. Shortly thereafter, on June 25, 2013, Panoche petitioned the superior court for an order vacating the award under section 1286.2, subdivision (a)(5). The award remained in effect from its inception until vacated by the superior court in late September 2013.

## G. Additional Regulatory Developments While the Arbitration Award was in Effect

Even as the arbitration proceeded and afterwards, the regulators continued attempting to decide how to deal with legacy contracts. On May 1, 2013, the CARB held a workshop to discuss the issue of legacy contracts with stakeholders, at which it was suggested that contracts involving IOUs and contracts involving other utilities should all be dealt with by the CARB, not the CPUC, and should be subject to the same rules. Beginning in late June 2013, the CPUC began expressing a willingness to cede authority to the CARB over contracts involving IOUs, so that all parties in legacy contracts would be treated the same; ultimately, in March 2014, the CPUC did cede authority to the CARB. (*Decision Clarifying Commission Policy on Greenhouse Gas Cost Responsibility for Contracts Executed Prior to the Passage of Assembly Bill 32* (Mar. 13, 2014) Cal.P.U.C. Dec. No. 14-03-003 [Cal.P.U.C. Lexis 145, at p. 1] (*Decision Clarifying CPUC Policy*).)

The CARB proposed a new regulation on July 15, 2013 that would provide transition assistance to energy producers in legacy contracts through the year 2014. The

22

essence of that regulation, as will be discussed more fully below, was that energy producers who were party to a power purchase and sale agreement in which the "price . . . does not provide for recovery of the costs associated with compliance with" the cap-and-trade program would be entitled to free "direct allocation" of allowances by the CARB through 2014. (See Cal. Code Regs., tit. 17, §§ 95802, subd. (a)(204), 95890, subd. (e), 95894.)

In recommending the new regulations, the CARB staff identified 19 contracts in dispute statewide and said: "In all cases, [the CARB] has encouraged resolution through contract renegotiation between the parties. In several cases, renegotiation has resolved the legacy contract concern. [The CARB] understands the approximately 19 remaining contracts to be in various stages of renegotiation. [The CARB] continues to encourage private resolution." The regulation the CARB proposed, staff believed, "maintain[ed] a strong incentive to continue renegotiation."

Stakeholder commentary on the proposed regulations continued through the summer, including commentary from PG&E and Panoche. Generally speaking, Panoche supported the new CARB regulation, while PG&E recommended changes. Among other things, PG&E suggested that "transition assistance" be provided only to those energy producers who signed contracts before August 15, 2005, when PG&E claimed the prospect of GHG-related costs was already clear. PG&E also suggested that the definition of legacy contracts should exclude contracts of energy producers against whom an arbitrator had ruled on the contract dispute with the utility.[8] PG&E also suggested that the CARB incorporate into its definition of "legacy contracts" language designed around its own second claim for declaratory relief: namely, that a power purchase agreement

_____

[8] After winning the arbitration with Panoche, PG&E began a fruitless attempt to convince the CARB and the CPUC that any proposed regulation to provide relief to energy producers under legacy contracts should exclude contracts in which an arbitration had determined the PPA accounted for GHG cost recovery. Although Panoche construes this as evidence that the CARB is simply not interested in whatever results arbitration may produce, we think that reads too much into the regulators' failure to adopt PG&E's suggestion.

23

would not be considered a legacy contract if, "at the time the agreement was executed, the [energy generator] understood that if there were a future change in the law that imposed a cost on the facility because of its greenhouse gas emissions, the [energy generator] would be responsible for paying that cost." These changes were not adopted by the CARB.

On September 4, 2013, while Panoche's petition to vacate the arbitration award was still pending, the CARB issued an Initial Statement of Reasons (ISOR) for its proposed regulations, including proposing to add a definition of "legacy contracts" that in substance is identical to the definition ultimately adopted some nine months later. (Compare CARB, Proposed Amendments to the California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms, Initial Statement of Reasons (ISOR), Appendix E (Sept. 4, 2013) Proposed Regulation Order, § 95802, subd. (a)(195) at < http://www.arb.ca.gov/regact/2013/capandtrade13/capandtrade13.htm> [as of July 1, 2016] with current Cal. Code Regs., tit. 17, § 95802, subd. (a)(204).)

With respect to consideration of individual contracts, the ISOR explained: "[The CARB] is not in a position to have full knowledge of the original negotiation and how GHG costs were discussed during these contract negotiations. In comments that [the CARB] received, there was apparent disagreement during the various discussions among parties as to how to consider the inclusion of such costs. It is not appropriate for [the CARB] to interject itself into the interactions between parties in private contract discussions where [the CARB] cannot possibly know what both sides intended when they executed the contract."

The ISOR did not, however, abandon the notion that the parties should continue trying to resolve their differences independently: "While [the CARB's] preferred approach to resolving the situation is for the parties to renegotiate the contracts, [the CARB] recognizes that renegotiation takes time." In the meantime, the ISOR explained, transitional relief for generators in legacy contracts would be provided under section 95894 of title 17 of the Code of Regulations.

24

## H. The Court Order Vacating the Arbitration Award

Panoche brought its petition to vacate the arbitration awards under section 1286.2, subdivision (a)(5), which authorizes a court to vacate an arbitration award if the "rights of the [petitioning] party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown . . . ." Under that section, if the statutory requirements are met, the court "shall" vacate the arbitration award. PG&E opposed the petition and requested that the court instead confirm the arbitrators' interim award and enter judgment accordingly pursuant to section 1287.4. Again, Panoche's briefing focused exclusively on the concept of ripeness, but this time it attempted to mold its arguments to fit within the linguistic frame established by section 1286.2, subdivision (a)(5) by arguing that the lack of ripeness constituted "sufficient cause" to "postpone" the arbitration.

On September 20, 2013, the trial court, having been kept up-to-date on the regulatory developments, granted Panoche's petition. The court ruled that Panoche's ripeness motion before the arbitration panel could be reviewed under section 1286.2, subdivision (a)(5) because (1) it amounted to a request to "postpone" the arbitration within the meaning of the statute; (2) it was supported by "sufficient cause"; and (3) Panoche was "substantially prejudiced" by the arbitrators' refusal to grant a delay in the proceedings while the CPUC and the CARB completed their regulatory proceedings. PG&E filed a timely notice of appeal from the court's order.

## I. Further Regulatory Developments after the Appeal Was Filed

In response to a request by Panoche, we take judicial notice of the following developments in the regulatory proceedings after the notice of appeal was filed. On November 8, 2013, the CARB proposed the amendments to the cap-and-trade regulation from the September 2013 ISOR, discussed above. Those amendments were adopted by the CARB in April 2014, and went into effect July 1, 2014. (CARB, Amendments to California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms, Resolution 14-4 (Apr. 25, 2014) (Resolution 14-4), at

25

<www.arb.ca.gov/regact/2013/capandtrade13/res14-4.pdf> [as of July 1, 2016]; history foll. Cal. Code Regs., tit. 17, § 95894.)

Meanwhile, at the CPUC, by February 10, 2014, an ALJ had also addressed the issue of legacy contracts in a proposed decision (Proposed CPUC Clarification Decision) setting forth a policy statement of the CPUC with respect to legacy contracts: "It is the policy of the [CPUC] that greenhouse gas costs and responsibility for such costs should be clearly articulated in Legacy Contracts in order to account for greenhouse gas costs in generation dispatch decisions. The [CPUC] reiterates this policy and orders the utilities to continue renegotiating contracts to include provisions to ensure that generators party to Legacy Contracts receive compensation for their greenhouse gas costs." The proposed decision again expressed the CPUC's disinclination to address the issue by interpreting individual contracts: "[The CPUC] does not find it appropriate to address issues of greenhouse gas cost responsibility at the individual contract level." We do not read that statement to mean that issues concerning contractual interpretation were to be ignored. Instead, the ALJ said, "The [CPUC] has consistently encouraged parties to resolve disputes over GHG cost responsibility in Legacy Contracts through negotiation and settlements or (if necessary) through the dispute resolution processes articulated in existing contracts." These observations were retained in the CPUC's *Decision Clarifying CPUC Policy, supra*, 2014 Cal.P.U.C. Lexis 145, at p. *1.

In the Proposed CPUC Clarification Decision, the CPUC also made the following observation: "*Most of the contracts raised in this proceeding, including the Panoche contract, were negotiated and signed at a time when it was reasonably foreseeable that there would be costs for GHG compliance in the future*, but the extent to which such costs were accounted for in the contracts may not be clear. To the extent that these Legacy Contracts do not contain terms that explicitly allocate responsibility for GHG compliance costs, it may not be clear which party, if any, bears responsibility for those costs under the contract. It would be inappropriate to amend a contract to require utilities and their ratepayers to pay those compliance costs a second time if they were accounted

26

for in the original contract. At the same time, the [CPUC] is not in a position to know whether GHG costs are already embedded in existing contracts; that is a factual question that is beyond the scope of this proceeding. *To make these factual determinations, Legacy Contracts must be examined individually, and avenues exist, such as a contract's explicit dispute resolution process, that are more appropriate than this proceeding for resolving questions of the presence or absence of specific GHG cost compensation terms and conditions in Legacy Contracts*." (Italics added.) The final decision omitted the first sentence of the quoted paragraph at Panoche's request. (See *Decision Clarifying CPUC Policy*, *supra*, 2014 Cal.P.U.C. Lexis 145, at pp. *14–15, *19-20.)

At the same time, however, the CPUC decided to defer to the developing CARB regulations on the issue of legacy contracts. Essentially, the CPUC decided that energy producers in contracts with IOUs should be treated the same as producers under contract with other utilities. The regulations now in force include the definition of "Legacy Contract" adopted by the CARB: " 'Legacy Contract' means a written contract or tolling agreement, originally executed prior to September 1, 2006, governing the sale of electricity and/or legacy contract qualified thermal output *at a price*, determined by either a fixed price or price formula, *that does not provide for recovery of the costs associated with compliance with this regulation*; the originally executed contract or agreement must have remained in effect and must not have been amended since September 1, 2006 to change or affect the terms governing the California greenhouse gas emissions responsibility, price, or amount of electricity or legacy contract qualified thermal output sold, or the expiration date. . . ." (Cal. Code Regs., tit. 17, § 95802, subd. (a)(204), italics added.) Energy producers who are parties to legacy contracts are granted "direct allocation" of allowances from the CARB, at no cost to the producers, under the new regulations. (*Id.*, § 95894.)

However, before receiving the first such direct allocation, and for each year in which an energy producer seeks to renew its eligibility, it is required to make a "[d]emonstration of [e]ligibility," including an attestation under penalty of perjury that its

27

PPA "does not allow the covered entity to recover the cost of legacy contract emissions from the legacy contract counterparty purchasing electricity and/or legacy contract qualified thermal output from the unit or facility."[9] (Cal. Code Regs., tit. 17, § 95894, subd. (a) & (a)(3)(A).) This requirement was included because it was "necessary to prove the information declared is true and to facilitate [the CARB] legal action against the entity requesting allowance allocation if the information submitted is false information." We take judicial notice that Panoche was granted transition assistance for the years 2013, 2014 and 2015 after review of its application for the reporting period ending September 2, 2014.

## III. DISCUSSION

### A. Because the PPA Restricted the Arbitrators' Power to that of a California Superior Court Judge, the Arbitrators Were Not Authorized to Entertain an Unripe Dispute.

Panoche structured its arguments both in the arbitration and before the trial court around a tenet of justiciability—ripeness—that is fundamental to judicial

---

[9] The regulation, entitled "Allocation to Legacy Contract Generators for Transition Assistance," requires any legacy contract generator seeking transition assistance to submit to the CARB by September 2 "each year," among other things, a copy of portions of its power purchase agreement reflecting commencement and cessation dates and the "[t]erms governing price per unit of product." (Cal. Code Regs., tit. 17, § 95894, subd. (a)(2).) In addition, each such generator must submit an annual "attestation under penalty of perjury" that: "(A) Each legacy contract does not allow the covered entity to recover the cost of legacy contract emissions from the legacy contract counterparty purchasing electricity and/or legacy contract qualified thermal output from the unit or facility; [¶] (B) The legacy contract was originally executed prior to September 1, 2006, remains in effect, and has not been amended since that date to change the terms governing the price or amount of electricity or legacy contract qualified thermal output sold, the GHG costs, or the expiration date; [and] [¶] (C) The operator of the legacy contract generator with an industrial counterparty or the legacy contract generator without an industrial counterparty made a good faith effort, but was unable to renegotiate the legacy contract with the counterparty to address recovery of the costs of compliance with this regulation." (*Id.*, subd. (a)(3).) The effort at renegotiation must have occurred since the last annual attestation was filed. Applicants must also update their submissions with any material changes occurring after submission. (*Id.*, subd. (a)(5).)

decisionmaking. But does the concept of ripeness apply in an arbitral setting to the same extent that it applies in court? After briefing in this appeal was completed, Division Four of the Second District Court of Appeal answered that question in the negative in *Bunker Hill Park Ltd. v. U.S. Bank National Assn.* (2014) 231 Cal.App.4th 1315 (*Bunker Hill*). Absent an agreement by the parties to import the doctrine of ripeness into their arbitration contract, the panel explained in *Bunker Hill*, a dispute that might not be justiciable in court for lack of ripeness is nonetheless arbitrable if it otherwise falls within the scope of the governing arbitration clause. (*Id.* at pp. 1325–1330.)

  *Bunker Hill* reasoned: "Arbitration is foremost a creature of contract. [Citation.] 'Arbitration's consensual nature allows the parties to structure their arbitration agreements as they see fit. They may limit the issues to be arbitrated, specify the rules and procedures under which they will arbitrate, designate who will serve as their arbitrator(s), and limit with whom they will arbitrate. ' [Citation.] Contracting parties also are free to negotiate and restrict the powers of an arbitrator and the universe of issues that he or she may resolve; ' "[t]he powers of an arbitrator derive from, and are limited by, the agreement to arbitrate." ' [Citation.] 'As for the requirement that there exist a controversy, it is sufficient the parties *contractually* have agreed to resort to a third party to resolve a particular issue.' [Citation.] 'The limited function reserved to the courts in ruling on an application for arbitration is not whether the claim has merit, but whether on its face the claim is covered by the contract.' [Citation.] Thus, we look to the terms of the parties' contract to ascertain whether they agreed to arbitrate a particular disagreement or to restrict the arbitrator to resolving certain issues." (*Bunker Hill*, *supra*, 231 Cal.App.4th at p. 1326.) Based on the foregoing considerations, the Court of Appeal in *Bunker Hill* ordered the superior court to compel the arbitration to proceed. (*Id.* at p. 1330.)

  *Bunker Hill* recognized that parties may contractually limit arbitrators' roles to the adjudication of justiciable controversies, and the present dispute is one in which they have done just that. The clause in question, part of the arbitration provision (Section

29

12.4(c)), does not actually mention ripeness or justiciability, but simply provides: "The Parties are aware of the decision in *Advanced Micro Devices, Inc. v. Intel Corp.*, 9 Cal.4th 362 (1994), and, except as modified by this Agreement, intend to limit the power of the arbitrator to that of a Superior Court judge enforcing California Law."

In *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362 (*Advanced Micro Devices*), the Supreme Court upheld an arbitrator's award that arguably exceeded the powers a superior court judge could have exercised in fashioning a remedy for breach of contract. (*Id.* at pp. 367, 390–391.) Specifically, the arbitrator fashioned a remedy for Intel's breach of implied covenants of good faith and fair dealing that gave Advanced Micro Devices (AMD) a permanent, nonexclusive, royalty-free license to Intel's 8086 generation of microprocessors. (*Id.* at pp. 385–386.) AMD petitioned to have the superior court confirm the award (§§ 1286, 1287.4), and Intel petitioned for it to correct the award (§ 1286.6) by striking two paragraphs, arguing that the remedy granted by the arbitrator exceeded the contractual remedies for breach. (*Advanced Micro Devices, supra,* at p. 371.) The trial court confirmed the arbitrators' award, but the Court of Appeal reversed, granting Intel the relief it requested. The Supreme Court later reversed the Court of Appeal's decision.

The Supreme Court held "our statutes (§§ 1286.2, [former] subd. (d), 1286.6, subd. (b)) do not distinguish between the arbitrators' power to decide an issue and their authority to choose an appropriate remedy; in either instance the test is whether the arbitrators have 'exceeded their powers.' Because determination of appropriate relief also constitutes decision on an issue, these two aspects of the arbitrators' authority are not always neatly separable." (*Advanced Micro Devices*, *supra*, 9 Cal.4th at p. 373.) "Arbitrators, unless specifically restricted by the agreement to following legal rules, ' "may base their decision upon broad principles of justice and equity . . . ." [Citations.] As early as 1852, this court recognized that, "The arbitrators are not bound to award on principles of dry law, but may decide on principles of equity and good conscience, and make their award *ex aequo et bono* [according to what is just and good]." [Citation.]'

30

(*Moncharsh* [*v. Heily & Blase* (1992) 3 Cal.4th 1, 10–11].)  Were courts to reevaluate independently the merits of a particular remedy, the parties' contractual expectation of a decision according to the arbitrators' best judgment would be defeated." (*Advanced Micro Devices*, *supra*, at pp. 374–375.)

PG&E argues Section 12.4(c) of the PPA does not incorporate the concept of ripeness into the arbitration because *Advanced Micro Devices* dealt only with the *remedial* powers of an arbitrator, whereas the ripeness limitation on adjudication has nothing to do with available remedies.  Because of the reference to *Advanced Micro Devices* in the preamble to Section 12.4(c), PG&E would have us interpret this language to mean "the *remedial* power . . . of a Superior Court judge."  Even if the decisionmaking power of courts and arbitrators could be neatly compartmentalized into "remedial" power and other kinds of power—an  idea the Supreme Court rejected in *Advanced Micro Devices—*the plain language of Section 12.4(c) undercuts PG&E's argument. We will not insert additional language into the PPA that the parties themselves did not include.  We instead conclude that part of "California law" which the arbitrators were empowered to enforce only to the same extent as a superior court judge was the rule limiting courts to the resolution of "ripe" controversies.  This case therefore comes within the exception envisioned in *Bunker Hill*.

### B.  The Appeal Is Not Moot.

Before addressing the ripeness issue, we turn to another threshold issue, this one at the other end of the justiciability spectrum—mootness.  On June 19, 2014, contemporaneously with filing its respondent's brief, Panoche filed a motion to dismiss the appeal as moot based on after-occurring developments in the regulatory proceedings, as described above.[10]  Panoche argued that "[o]n April 25, 2014, the CARB passed its

---

[10] Panoche's motion to dismiss was initially denied, and the accompanying request for judicial notice was granted.  Those orders were vacated, however, on the court's own motion, and the court ordered the motion and request for judicial notice to be decided with the appeal.  For reasons stated in text, we now deny Panoche's motion to dismiss the appeal and grant its request for judicial notice. (Evid. Code, §§ 452, 459.)  Panoche's

31

final cap-and-trade amendments, awarding Panoche and other similarly-situated parties 'transitional relief' to cover their GHG costs for the first five years of the CARB's cap-and-trade program (i.e., until AB 32's expiration), with the opportunity to obtain additional relief in the future." Ironically, by arguing mootness, Panoche in effect claims its disagreement with PG&E is both unripe and overripe. Panoche never explains when exactly, if ever, the controversy was ripe. It has consistently claimed and continues to claim the contract dispute had not yet "congealed" into a justiciable controversy as of the time of the arbitration, yet also claims that by June 19, 2014—before this appeal was fully briefed—events in the regulatory arena had so far overtaken these proceedings as to render the appeal moot. For the reasons that follow, we cannot accept this logic.

"[W]hen, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal." (*Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132, quoting *Consolidated Vultee Aircraft Corp. v. United Auto. Etc. Workers* (1946) 27 Cal.2d 859, 863.) Witkin, with characteristic clarity, distinguishes the two concepts thusly: Unripe cases are "[t]hose in which parties seek a judicial declaration on a question of law, though no actual dispute or controversy ever existed between them requiring the declaration for its determination." (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 21, p. 85.) Moot cases, in contrast, are "[t]hose in which an actual controversy did exist but, by the passage of time or a change in circumstances, ceased to exist." (*Id*. at p. 86.)

Thus, " 'ripeness is not a static state'[citation], and a case that presents a true controversy at its inception becomes moot ' "if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character" ' " (*Wilson & Wilson v. City Council of Redwood City* (2011) 191

---

supplemental request for judicial notice filed November 26, 2014 is also granted. PG&E's request for judicial notice filed January 4, 2016 is denied.

32

Cal.App.4th 1559, 1573 (*Wilson & Wilson*).) "The pivotal question in determining if a case is moot is . . . whether the court can grant the plaintiff any effectual relief. [Citations.] If events have made such relief impracticable, the controversy has become 'overripe' and is therefore moot." (*Id.* at p. 1574.) An appeal is not moot, however, where "a material question remains for the court's consideration," so long as the appellate decision can grant a party to the appeal effectual relief. (*Vargas v. Balz* (2014) 223 Cal.App.4th 1544, 1550–1551.) Thus, "an appeal will be decided . . . where part but not all of the controversy has been rendered moot." (*Mercury Interactive Corp. v. Klein* (2007) 158 Cal.App.4th 60, 78.)

The unresolved question of costs and attorney fees, by itself, is enough to defeat Panoche's mootness argument. The PPA includes a fee-shifting provision that allows recovery of arbitration costs and reasonable attorney fees to the "prevailing party." The arbitrators' decision in May 2013 left the question of fees open, but PG&E was determined to be the prevailing party. After the arbitration, PG&E submitted a petition for fees and costs, claiming approximately $1.5 million in fees and nearly $228,000 in costs. After the arbitration award was vacated, Panoche filed a claim in the arbitration for approximately $1.7 million in attorney fees and $383,000 in costs. The arbitrators have postponed ruling on the fees issue pending the outcome of this appeal. Since the arbitrators' decision may drive the "prevailing party" determination in the arbitration, this appeal is not moot for that reason alone. (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 881; *Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 365; *Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 510, fn. 3; *Mapstead v. Anchundo* (1998) 63 Cal.App.4th 246, 278–279 [no rationale supports the theory that "a party who should have lost on the merits at trial becomes the 'successful party' when the issues become moot on appeal"]; *Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1750–1751.)

While Panoche may ultimately be correct in its assessment of the course of public policy going forward, we note that it overstates what the future holds for GHG regulation in California. Panoche contends that AB 32 "expir[es]" in 2017, but that does not appear to be the case. The current GHG reduction targets under AB 32 extend until 2020 (Health & Saf. Code, § 38550), and the Legislature has expressed the intent that GHG emissions limits "shall remain in effect unless otherwise amended or repealed," with the expectation that such limits will "continue in existence and be used to maintain and continue reductions in emissions of greenhouse gases beyond 2020." (Health & Saf. Code, § 38551, subds. (a) & (b).) Thus, one of the foundations of Panoche's mootness argument crumbles. In addition, the PPA will remain in effect until sometime in 2029. Given these long-range legislative objectives and the long-term contract in dispute, we expect the question of GHG emissions and the cost of reducing those emissions to continue to be an issue subject to regulation in California—and subject to dispute between the parties—for the foreseeable future, not a matter that has been settled definitively by the regulations now in effect. Moreover, although the CARB has arrived at a final definition of "legacy contracts," Panoche suggests that this definition resolves all issues related to this appeal, but that is plainly not the case. The new regulation is not a self-executing grant of free allowances in perpetuity. It merely allows Panoche to receive such allowances if it attests under oath, annually, that the PPA "does not allow [Panoche] to recover the cost of legacy contract emissions from [PG&E]." (Cal. Code Regs., tit. 17, § 95894, subd. (a)(3)(A).)

Given the parties' disagreement over whether the PPA allows Panoche to "recover" the costs of GHG compliance, we think it undeniable that the "demonstration of eligibility" requirement contained in the new regulation draws into question the contents and meaning of the PPA, including the arbitrators' resolution of that dispute. Although we are of the view that the arbitration decision has clear, ongoing relevance to Panoche's eligibility for "legacy contract" treatment going forward, we hasten to add that it in no way binds the hands of the regulators. The CARB may decide for policy reasons

34

that Panoche should get free allowances in spite of the arbitrators' decision. We have nothing to say about that. The regulators have broad policy-making power and they might decide, for example, that the general policy of sending a "price signal" to the public is a paramount consideration. Clearly, the arbitrators believed the risk of exposure to AB 32 compliance costs was known to and taken into account by Panoche when it entered the PPA in March 2006. While they made a thoughtful, considered, and in many ways compelling determination on that issue, they repeatedly emphasized that their focus was limited to contract interpretation.[11] As we explain further below, the arbitrators were tasked with deciding an issue that, while *relevant* to ongoing regulatory proceedings, was fundamentally retrospective in nature, while the "legacy contract" issue pending in the regulatory arena was not only prospective in nature, but was suffused with policy considerations that the arbitrators were not capable of addressing.

**C. The Contractual Dispute Between PG&E and Panoche Was Ripe When the Arbitration Commenced, and Panoche Failed to Show Sufficient Cause to Postpone the Arbitration Under Section 1286.2, Subdivision (a)(5).**

    1. *Limited judicial review of arbitration awards and the standard of review on appeal.*

" 'The merits of the controversy between the parties [to a private arbitration

---

[11] Panoche argues vehemently that the panel got it wrong, since "when the PPA was signed in March 2006—months before AB 32 was passed and years before CARB proposed any cap-and-trade program—the parties could not have specifically addressed GHG allowances under any regulatory cap-and-trade scheme because no such regulations existed at the time." The point is not without force, but assessing as a factual matter what the parties discussed and understood in the negotiation of the PPA was a matter exclusively for the arbitrators. And in any event, to the extent Panoche complains that the full weight of the cost burden it undertook could never have been foreseen until the legislative and regulatory process that created cap-and-trade in California had run its course, a more fitting contract defense may have been commercial frustration, which it has never argued. (See *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1336 ["where performance remains possible, but the reason the parties entered the agreement has been frustrated by a supervening circumstance that was not anticipated, such that the value of performance by the party standing on the contract is substantially destroyed, the doctrine of commercial frustration applies to excuse performance"].)

agreement] are not subject to judicial review.' [Citations.] More specifically, courts will not review the validity of the arbitrator's reasoning. [Citations.] Further, a court may not review the sufficiency of the evidence supporting an arbitrator's award. [Citations.] [¶] Thus, it is the general rule that, with narrow exceptions, an arbitrator's decision cannot be reviewed for errors of fact or law." (*Moncharsh v. Heily & Blase*, *supra*, 3 Cal.4th at p. 11; see also, e.g., *Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 916; *SWAB Financial, LLC v. E\*Trade Securities, LLC* (2007) 150 Cal.App.4th 1181, 1195 (*SWAB Financial*); *Jones v. Humanscale Corp.* (2005) 130 Cal.App.4th 401, 407–408.) Section 1286.2, subdivision (a), which sets forth grounds for vacating an arbitration award, is an exception to the general rule. (*SWAB Financial, supra*, at p. 1196.) We are concerned in this appeal with subdivision (a)(5), which has been called "a safety valve in private arbitration that permits a court to intercede when an arbitrator has prevented a party from fairly presenting its case." (*Hall v. Superior Court* (1993) 18 Cal.App.4th 427, 439 (*Hall*) [discussing § 1286.2, former subd. (e), which is now subd. (a)(5)]; accord, *Epic Medical Management, LLC v. Paquette* (2015) 244 Cal.App.4th 504, 518; *Schlessinger v. Rosenfeld, Meyer & Susman* (1995) 40 Cal.App.4th 1096, 1111.)

The parties agree that the court's order vacating the arbitration award is subject to de novo review on appeal. "We review the trial court's ruling de novo, but defer to the factual and legal findings made by the arbitrator. (*California Faculty Assn. v. Superior Court* (1998) 63 Cal.App.4th 935, 943–945; *Oaktree Capital Management, L.P. v. Bernard* (2010) 182 Cal.App.4th 60, 68–69.) '[W]e do not review the arbitrator's findings . . . , but take them as correct.' (*Roehl v. Ritchie* (2007) 147 Cal.App.4th 338, 347.)" (*Cotchett, Pitre & McCarthy v. Universal Paragon Corp.* (2010) 187 Cal.App.4th 1405, 1416.) To the extent the superior court judge made factual findings that are not inconsistent with the arbitrators' findings, we review them for substantial evidence. (*SWAB Financial*, *supra*, 150 Cal.App.4th at pp. 1196, 1198.) Ripeness, too, is generally a legal issue subject to de novo review. (*Bunker Hill*, *supra*, 231 Cal.App.4th at p. 1324; *Environmental Defense Project of Sierra County v. County of Sierra* (2008) 158

36

Cal.App.4th 877, 885.)  We therefore employ our independent judgment in deciding this issue.

2. *The question of contract interpretation was ripe for arbitration.*

" 'The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.]  It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion.  It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes.  However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy.  On the other hand, the requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question. [Citations.]' . . .  As the Court of Appeal observed in *California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 22, '[a] controversy is "ripe" when it has reached . . . the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' " (*Vandermost v. Bowen* (2012) 53 Cal.4th 421, 452, italics omitted, quoting *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170.)

When applied in the context of concurrent judicial and administrative proceedings, the ripeness doctrine can serve the salutary purpose of " ' "prevent[ing] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." ' " (*Davis v. Southern California Edison Co.* (2015) 236 Cal.App.4th 619, 645, fn. 19, quoting *Pacific Legal Foundation v. California*

*Coastal Com.*, *supra*, 33 Cal.3d at p. 171.) Whether in that context or others, however, an issue is ripe for resolution if it "arises from a genuine present clash of interests and the operative facts are sufficiently definite to permit a particularistic determination rather than a broad pronouncement rooted in abstractions." (*Safai v. Safai* (2008) 164 Cal.App.4th 233, 244.) Analytically, the test for ripeness is two-fold: we must (1) determine whether the issue is " 'appropriate for immediate judicial [or arbitral] resolution,' " and then (2) analyze " 'the hardship that may result from withholding court [or the arbitrators'] consideration.' " (*Wilson & Wilson*, *supra*, 191 Cal.App.4th at p. 1582.)

We are satisfied that, on the first step, PG&E's contract dispute with Panoche was "appropriate for immediate [arbitral] resolution." PG&E argues, and we agree, that the question of transitional relief for legacy contract power generators involves two distinct issues—contract interpretation and policy making. That the contract issues and the regulatory issues were "intertwined," as the superior court suggested, does not lead inexorably to the conclusion that a proceeding to interpret the PPA would be in conflict with the progress of the regulatory proceedings, would be dependent on the outcome of the regulatory proceedings, or would be in some other way premature. Nor do we agree that addressing the contractual issues prior to the regulators' resolution of the policy questions caused the arbitrators or the courts to "step outside the courtroom into the vortex of political activity." (*Hobson v. Hansen* (D.D.C. 1967) 265 F.Supp. 902, 923.) On the contrary, we conclude the arbitrators and the regulators were operating in largely distinct spheres and addressing largely different questions. Accordingly, the pendency of regulatory proceedings did not, in and of itself, render the contractual issues unripe for arbitration.

Panoche's lack-of-ripeness argument rests on the premise that contract interpretation was pointless because the regulators had decided they would not look at the provisions of individual contracts to establish statewide policy. Ergo, Panoche suggests, the arbitration should have been dismissed. Alternatively, Panoche argues, the arbitration

38

at least should have been postponed until after the regulators made a final determination about the definition of "legacy contract." We are not persuaded. In our view, by referring to contractual provisions in their various pronouncements, proposed rules, and final rules concerning "legacy contracts," the CPUC and the CARB embedded into the test for eligibility a need to consider the PPA's terms. Given the CPUC's and the CARB's refusal to try to resolve conflicts between individual parties as to the terms of their contracts, the agencies' continuing expressed preference for the parties to resolve their contractual disputes independently, and the persistent dispute between PG&E and Panoche over whether AB 32 compliance costs were addressed in the PPA, PG&E was justified in viewing arbitration as a practical necessity to resolve that contract interpretation dispute.

The regulatory proceedings, on the other hand, have led to and will continue to involve public policy determinations about how to fairly allocate the cost burden of AB 32 more broadly. The interpretation of the PPA as reflected in the arbitrators' reasoned decision was certainly relevant to the public policy issues before the CPUC and the CARB; indeed, the pendency of those regulatory issues was the very reason PG&E initiated the arbitration. Panoche, understandably, wished to remain free in the regulatory arena to place its own "spin" on the PPA, but by agreeing to a private dispute resolution procedure, Panoche ran the risk that PG&E would call its bluff, obtain a binding ruling from an arbitration panel on disputed issues of contract interpretation, and use that ruling to try to block Panoche from continuing to promote what PG&E believed was an inaccurate view of the PPA before the agencies. The risk ran the other way as well, of course, and had the arbitrators adopted Panoche's perspective, the shoe would have been on the other foot. Because these are two very sophisticated parties, fully capable of assessing how the arbitration clause might be used—and rejecting it upfront, if it was a poor fit for the highly regulated environment involved here—we are loathe to prevent enforcement of the clause because the party invoking it, PG&E, may have found it useful as a means to gain perceived tactical advantage before the regulators. We would be

39

surprised if there was not some such motivation at work, but in the end PG&E's motivation is irrelevant. Arbitration was a tool at the disposal of both parties, and we see nothing wrong with the way PG&E chose to use it here.

It is no mystery how the parties' contract interpretation dispute was pertinent to the regulatory proceedings at the time this dispute was arbitrated. The parties have long disagreed, and disagreed sharply, on who ultimately should bear the costs of AB 32 compliance. At the time PG&E demanded arbitration, the parties were engaged in vigorous lobbying campaigns centering on this issue, each offering diametrically opposing views to the regulators about whether, in fact, the PPA addressed AB 32 compliance costs. Panoche argues that, to resolve the dispute, it was necessary for the arbitrators to wait for the regulatory process to run its course, because that process was bound to provide "guidance," and perhaps would be outcome-determinative. As the arbitrators noted, however, the meaning of the contract was something to be determined retrospectively, looking at the historical facts, and applying well-known principles of contract law. Nothing pending before the regulators was going to change that decisionmaking frame. Granted, if, *going forward*, the regulators wish to override the PPA for policy reasons, they were and are empowered to do so, but that is a separate regulatory issue which the arbitrators eschewed any interest in addressing. The CPUC and the CARB, for their part, drew the same line of demarcation from the opposite perspective, commenting repeatedly on the impracticality of attempting their own examination and interpretation of individual power purchase and sale contracts.

But while it is clear the CPUC and the CARB wished to avoid deciding contract-specific issues, they never *affirmatively* indicated a disinterest in, refusal to consider, or rejection of the relevancy of such contracts to the question of an individual energy generator's eligibility for transition assistance. That is understandable because the issue of whether a particular contract allocated GHG compliance costs in a particular way was so plainly relevant for regulatory purposes when PG&E demanded arbitration, and is still relevant today. The CPUC ALJ's proposed definition of "legacy contracts" in August

40

2012—the proposed definition upon which Panoche framed its counterclaim—focused on whether the contract at issue "explicitly" provided for allocation of GHG compliance costs or had a "mechanism" of doing so. And under the CARB's "legacy contract" definition, as finally adopted, any entity claiming to be a party to a legacy contract must *prove* its eligibility by attesting that the PPA "does not allow the covered entity to recover the cost of legacy contract emissions from the legacy contract counterparty . . . ." (Cal. Code Regs., tit. 17, § 95894, subd. (a)(3)(A).) Thus, the definition adopted by the CARB, and the transitional relief offered, both to some degree turn on the content of the PPA: specifically, whether it "provide[d or did not provide] for recovery of the costs associated with compliance with [the cap-and-trade] regulation" (Cal. Code Regs., tit. 17, § 95802, subd. (a)(204)) and whether it "allow[ed or did not allow] the covered entity to recover the cost of legacy contract emissions from the legacy contract counterparty purchasing electricity . . . from the unit or facility" (*id.*, § 95894, subd. (a)(3)(A)).

We therefore agree with the arbitrators that their opinion was not merely advisory. It settled a real and ongoing dispute between the parties that had reached a point at which the dispute was threatening to have a significant financial impact on one party or the other. The fact that the panel's resolution of that bilateral dispute might ultimately be disregarded by the regulators did not transform the arbitrators' decision into a merely "advisory" opinion, particularly given the potential for recurrence of the dispute in the future. We think this case is comparable to *Steinberg v. Chiang* (2014) 223 Cal.App.4th 338, in which a dispute between the state Controller and the state Legislature developed regarding the Controller's authority to withhold legislators' paychecks for the alleged failure of the Legislature to enact a balanced budget by the constitutional deadline. (*Id.* at pp. 341–342; Cal. Const., art. IV, § 12(c)(3), (g) & (h).) One week after their paychecks were suspended, the legislators passed a new balanced budget and their pay was reinstated. (*Id.* at p. 342.) Though the Controller claimed there was no live controversy and the plaintiffs were requesting an advisory opinion, a panel of the Third District Court of Appeal deemed the issue ripe for resolution because "the parties have an ongoing

41

relationship in which this existing dispute . . . can arise again in the future." (*Id.* at p. 341.) Likewise in our case, though the parties may be in a temporary state of uneasy détente due to the regulators' largesse, in this contentious area of energy regulation the dispute between PG&E and Panoche relating to the correct interpretation of their PPA could flare up at any time in the future, depending on further regulatory action or even in its absence.

Even to the extent there may have been some duplication of effort or some expense in conducting the arbitration, which Panoche characterizes as "wasted" if the regulators were to end up ignoring the arbitrators' reasoned decision, that risk is overridden when the second prong of the ripeness inquiry is considered, namely " 'the hardship that may result from withholding [the arbitrators'] consideration' " (*Wilson & Wilson*, *supra*, 191 Cal.App.4th at p. 1582; accord, *Pacific Legal Foundation v. Cal. Coastal Com., supra*, 33 Cal.3d at p. 171), which must be an "imminent and significant hardship inherent in further delay" (*Stonehouse Homes LLC v. City of Sierra Madre* (2008) 167 Cal.App.4th 531, 542; *Farm Sanctuary, Inc. v. Dept. of Food & Agric.* (1998) 63 Cal.App.4th 495, 502). PG&E has made a sufficient showing of hardship.

Panoche had been advocating in regulatory proceedings that PG&E should bear the cost of GHG allowances itself because it could pass the cost along to its customers, thereby sending a "price signal" to reduce consumption. The CPUC and the CARB both thought the best general policy was to have the utilities pay. But that is precisely what PG&E claims it had bargained to avoid before this general policy had been articulated, and the CPUC agreed that putting the cost burden on PG&E in such a case would effectively make PG&E's ratepayers pay twice, while Panoche would be let off the hook altogether. Given the potential financial impact on PG&E and its customers, together with PG&E's desire to influence the regulators before it was too late for them to choose a different path where Panoche was concerned, we perceive a plain and imminent hardship to PG&E if the arbitration had been postponed. The fact that the CARB, as an interim solution, after the arbitration, elected to grant Panoche direct allocation of free

42

allowances through a transition period without cost to PG&E, does not alter the fact that PG&E faced a looming potential liability for Panoche's allowances at the time it initiated the proceeding.

Panoche insists that the CARB and the CPUC have no use for any consideration of the terms of individual contracts when making policy for the whole state. We do not agree. We are not suggesting the regulators will necessarily be guided by the terms of individual contracts, nor does confirmation of the arbitration award in any way imply they should. But every indication so far from the regulators is that they are expecting and awaiting a definitive resolution of the parties' contractual dispute, which the regulators have instructed the parties to pursue outside of the regulatory proceedings. The weight to be given the arbitration award by the regulators—indeed, whether they will consider it at all—is entirely up to them, but for purposes of evaluating whether the dispute presented to the arbitration panel was sufficiently concrete for decision and whether its resolution was capable of putting to rest uncertainty *around the meaning of the contract*, the controversy was ripe.

Finally, we must note, to the extent any matter in dispute in the arbitration was unripe, it would appear to be Panoche's first counterclaim, which asked for an interpretation of the contract in accordance with the interim CPUC definition of legacy contracts, rather than awaiting the CARB's final definition. (Cf. *Pac. Gas & Elec. Co. v. Lynch* (C.D.Cal. May 2, 2001) 2001 U.S. Dist. LEXIS 5500, *47–*51 [challenge to "non-final interim order of a state agency" held to be unripe].) By its framing of that counterclaim Panoche attempted to link inextricably the contract issues with the regulatory proceedings, arguing that the former could not be decided until after the latter were completed. As we have now explained, there is no necessity that the regulators decide the policy issue before the contract issues may be determined, and to the extent there is a natural sequence, it would seem better to decide the contract issues sooner rather than later. Panoche could not render the entire arbitration "unripe" by interjecting a premature counterclaim. PG&E's distinct contract interpretation claims were certainly

43

ripe and subject to immediate arbitration. We conclude that, under both the first and second prongs of the ripeness analysis, the dispute between PG&E and Panoche was ripe at the time of the arbitration.

3. *Panoche Failed To Show Sufficient Cause for a Postponement Because it Did Not Show that Denying a Stay of the Arbitration Prevented it from Fairly Presenting its Case or Otherwise Put it at a Procedural Disadvantage in Defending Against PG&E's Claim for Declaratory Relief.*

Despite our resolution of the ripeness issue, Panoche argues that "sufficient cause" may have existed for a postponement, even if PG&E's claims technically were ripe. Although we agree that the nomenclature of the statute governs the appeal, we note that Panoche's present stance seems at odds with the position it took in its motion for dismissal or stay of the arbitration, which was devoted exclusively to the question of ripeness, and the position it consistently took in the trial court and before this court that "sufficient cause" was established for a postponement precisely *because* the issues were unripe for arbitration.

Turning to the statute, preliminarily we note that Panoche asked for dismissal or a "stay" of the arbitration,[12] not a brief postponement. The Supreme Court recently had occasion to distinguish a stay of proceedings from a continuance. Whereas a "stay" "refers to those postponements that freeze a proceeding for an indefinite period, until the occurrence of an event that is usually extrinsic to the litigation and beyond the plaintiff's control," a "continuance" is more likely to postpone a trial to a "date certain" which is "not tied to any matter outside the parties' control."[13] (*Gaines v. Fidelity National Title*

---

[12] When Panoche made its ripeness motion in January 2013, it predicted that the regulatory proceedings would result in a final resolution of the legacy contract issue by August 2013. Instead, governing regulations were not adopted by the CARB until April 2014. (CARB Resolution 14-4, *supra*.)

[13] Because it sought a stay, rather than a brief time-limited postponement, Panoche's argument is similar to a claim that a court should abstain from hearing a case due to the pendency of related legislative proceedings. In that context, it is not enough that regulatory action *might* at some point in the future resolve the issue subject to litigation. For the doctrine of judicial abstention to apply, it must be clear that (1) the

44

*Ins. Co.* (2016) 62 Cal.4th 1081, 1092–1094.) Given this distinction, it is certainly arguable that a request for a "stay" is not tantamount to a request "to postpone" the arbitration.

But moving beyond that issue, we also decline Panoche's invitation to formulate a shorthand standard expressly adapted to determining "sufficient cause" for postponing an arbitration in the case of concurrent arbitration and regulation. Panoche cites *Naing Intern. Enterprises v. Ellsworth Associates* (D.D.C. 1997) 961 F.Supp. 1, 3–4 (*Naing*) for the proposition that "[a] party presents 'sufficient cause' necessary to postpone an arbitration by establishing that a government agency is considering information 'pertinent and material to [the party's] claims and defenses during arbitration."[14] We think adopting this as an across-the-board standard in cases involving pending regulation adds an unnecessary gloss to the "sufficient cause" standard, too thoroughly ties arbitrators' hands in ruling on continuance motions, and lends itself too easily to manipulation of the timing of arbitration for purposes other than obtaining a fair hearing. We need not reach across the country to find case law or borrow language from a federal statute to find a useful measure of "sufficient cause." We have already cited *Hall* and similar cases calling section 1286.2 "a safety valve in private arbitration that permits a court to intercede when an arbitrator has *prevented a party from fairly presenting its case*." (*Hall*,

---

issue being litigated in the judicial forum would enmesh the court in complex issues of regulatory policy that are better addressed in a regulatory forum, and (2) the Legislature is seeking to address the exact issues being litigated in the judicial forum or has provided an alternative means of resolving them, rather than simply having announced an intention to act in the area or undertaken investigatory activities that indicate a mere possibility of the issues in litigation being addressed sometime in the future. (See *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1367–1373.)

[14] Alternatively, Panoche suggests that the phrase "sufficient cause" should be equated with "good cause" for continuance of a trial, citing *Roitz v. Coldwell Banker Residential Brokerage Co.* (1998) 62 Cal.App.4th 716, 724 (*Roitz*) and *Moore v. Griffith* (1942) 51 Cal.App.2d 386, 389 (*Moore*). But good cause for continuance of trial also focuses on threats to procedural fairness as the touchstone for granting such a motion. (See § 595.4; Cal. Rules of Court, rule 3.1332.)

*supra*, 18 Cal.App.4th at p. 439, italics added.) In other words, a party seeking a continuance of arbitration may later have the arbitration award vacated only if the court finds the denial of the continuance imposed upon the moving party a procedural disadvantage in the arbitration due to its scheduling.[15] Identifying an abstract "pertinent and material" relationship between regulatory action and issues subject to arbitration is not enough.

The trial court, too, relied heavily on *Naing*, calling it "largely indistinguishable." We disagree. In that case, Naing International Enterprises, Inc. (Naing), one of two companies that had signed a merger agreement, represented in the contract that it was eligible for participation in the Small Business Administration's (SBA's) Section 8(a) Program (15 U.S.C. § 637(a)), which allows preferences in government contracting for disadvantaged minority-owned firms, and made related representations tending to assure such eligibility would continue. (*Id.* at p. 2.) The other company (EAI) refused to go through with the merger after questions developed as to whether Naing's representations concerning eligibility were true. (*Ibid.*) The parties submitted the dispute to arbitration for alleged breach of contract. (*Ibid*.)

At the time arbitration was initiated, the SBA was investigating the very same issue—Naing's eligibility for Section 8(a) participation—and the issue apparently hinged on whether the merged entity could assume contracts then held by EAI and still retain eligibility. (*Naing*, *supra*, 961 F.Supp. at pp. 2, 4.) Less than two months before the arbitration hearing began, the SBA's Inspector General issued a report recommending that Naing be terminated from the Section 8(a) Program. (*Ibid.*) The report set a deadline less than a month after the arbitration was scheduled to begin for the SBA to act

---

[15] Indeed, in the majority of cases decided under section 1286.2, parties have invoked the "sufficient cause" language of the statute to ensure personal presence during the arbitration (*Humes v. MarGil Ventures, Inc.* (1985) 174 Cal.App.3d 486, 496–498), to secure additional evidence (*Roitz*, *supra*, 62 Cal.App.4th at pp. 720, 722–725; *Communications Workers v. General Telephone Co.* (1981) 127 Cal.App.3d 82, 86–87; *Shammas v. National Telefilm Associates* (1970) 11 Cal.App.3d 1050, 1055–1056), or to be represented by counsel (*Moore*, *supra*, 51 Cal.App.2d at p. 388).

46

on the recommendation. (*Id.* at p. 4.) Shortly before the start of arbitration, a party aligned with EAI moved to postpone the hearing until the SBA acted, but the request was denied. (*Ibid.*) Naing prevailed in the arbitration, and EAI sought to vacate the award under the Federal Arbitration Act, 9 U.S.C. § 10(a)(3), on grounds similar to those asserted by Panoche here.[16] (*Id.* at pp. 2–3.)

The federal district court granted the motion to vacate the award because "[t]here is little doubt that a final action by the SBA as a result of its investigation into [Naing's] eligibility would have been pertinent and material to EAI['s] . . . claims and defenses during arbitration. The SBA, as the agency responsible for the 8(a) Program, is responsible for determining eligibility for participation in the program and to investigate matters related to participation therein. Its determination as to [Naing's] eligibility and the accuracy of the information [Naing] submitted to it would have been compelling evidence as to the respondents' principal claims and defenses." (*Naing, supra*, 961 F.Supp. at p. 3.) We note, in addition, that *Naing* never mentioned the word "ripeness," but rather focused its analysis on evidence that could have been admitted if a continuance had been granted, resulting in the deprivation of one party's right to a full and fair hearing. (*Id.* at pp. 3–6.)

*Naing* presents a factual scenario that in significant respects is quite different from ours. As noted, in *Naing*, the issue under regulatory consideration—Naing's eligibility

---

[16] The statutory standard under the Federal Arbitration Act applied in *Naing*, to be sure, differs in at least one significant respect from section 1286.2, subdivision (a)(5), the provision of the California Arbitration Act invoked in this case by Panoche. The federal statute requires "misconduct" by the arbitrator "in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy" before an arbitration award will be vacated. (9 U.S.C. § 10(a)(3).) A statutory precursor to current section 1286.2, subdivision (a)(5) was former section 1288, subdivision (c): "Where the arbitrators were guilty of misconduct, in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence, pertinent and material to the controversy." (Former section 1288, enacted 1872, amended by Stats. 1927, ch. 225, § 9, repealed by Stats. 1961, ch. 461, § 1.) The "misconduct" element of the test for improper refusal to postpone an arbitral hearing no longer appears in section 1286.2, subdivision (a)(5).

for the Section 8(a) Program—was identical to the issue EAI was raising as its defense in the breach of contract arbitration as its explanation for refusing to go through with the merger. (*Naing*, *supra*, 961 F.Supp. at pp. 3–4.) If the SBA were to determine that Naing was not eligible, as appeared likely, that certainly would have a direct bearing on whether Naing misrepresented its eligibility status and prospects, as EAI alleged. The district court in *Naing* noted that the arbitrators themselves knew the SBA investigation was pending during the arbitration (*ibid.*) and had "acknowledged the relevancy of any SBA investigation to the arbitration" (*id.* at p. 3). In other words, the crux of the parties' dispute in arbitration *turned on* the outcome of the regulatory proceedings. The same is not true here.

Thus, we do not read *Naing* as having the far-reaching significance that Panoche ascribes to it. First, we do not agree that *Naing* sets forth a new and distinct "pertinent and material" standard for determining "sufficient cause" for a postponement of arbitration in light of pending regulatory action. The "pertinent and material" language is derived from a different clause of the federal statute, which relates to the arbitrators' refusal to hear evidence "pertinent and material to the controversy." (9 U.S.C. § 10(a)(3).) Moreover, the regulatory proceedings in *Naing* were not just "pertinent and material" to the broadly-stated *issues* being arbitrated; the proceedings were "pertinent and material" to specific "claims and defenses" asserted in the arbitration, and were in fact likely to produce " 'pertinent and material evidence' " for use in the arbitration. (*Naing*, *supra*, 961 F.Supp. at p. 3.) As we read *Naing*, it was the impact on the procedural fairness of the arbitration that the court found controlling: "[I]f the failure of an arbitrator to grant a postponement or adjournment *results in the foreclosure of the presentation of 'pertinent and material evidence,'* it is an abuse of discretion." (*Ibid.*, italics added.)

Hence, the rule we apply is consistent with *Naing*. A procedural disadvantage—or that a party was "prevented . . . from fairly presenting its case" (*Hall, supra,* 18 Cal.App.4th at p. 439)—was a factor certainly at play in *Naing*, where EAI had a

48

potential defense to the breach of contract claim based on Naing's failure to retain Section 8(a) status. (*Naing*, *supra*, 961 F.Supp. at p. 3.) In our case, though Panoche refers to its "defenses" to PG&E's contract-related claims being dependent upon the regulators' decisions, in fact Panoche's entitlement or lack of entitlement to transition assistance would not constitute a "defense" to PG&E's declaratory relief claims. Nor has there been a regulatory determination that Panoche is entitled to transition relief "for at least the first five years of [the] CARB's cap-and-trade program," as it has represented; rather, Panoche is simply entitled to *apply* for such relief on an annual basis, with its ultimate eligibility to be determined on an individual year-to-year basis depending on a sworn factual showing. To the extent there is any required order in which the resolution of issues should proceed, we view the resolution of the contractual issues as a prerequisite to application of the entitlement criteria, and thus it was perfectly appropriate for the arbitrators to address the contract questions before the regulators' decisions were finalized.

Though *Naing* bears some similarity to our case in that both involve construction of a contract by an arbitration panel while related regulatory proceedings are ongoing, the similarity ends there. The SBA's ruling would have a direct and substantial bearing on whether Naing had breached the agreement (and whether EAI was or was not required to go through with the merger regardless of the breach)—which were the issues in dispute. EAI was able to point to specific evidence likely to come out of the regulatory proceedings–namely, a determination whether Naing was eligible for section 8(a))–that would have materially strengthened its defense in the arbitration. Panoche has never identified any specific anticipated decision by the regulators that would influence the retrospective *contract interpretation* issues before the arbitrators. Although it complains of its inability to furnish the arbitrators with the final regulations, as we have discussed, that "evidence" is unlikely to have influenced their interpretation of the PPA. Moreover, in our case, no breach of the PPA was alleged. The only relief sought was a declaration of Panoche's obligations under the PPA at the time it was signed. PG&E's request for

49

declaratory relief on a matter of contract interpretation was not dependent on any issues pending before the CARB or the CPUC. From PG&E's perspective, the purpose of the arbitration was to *inform* the regulators' ongoing consideration of the policy issue, and thus there was some urgency in having a resolution *before* the regulators made any final decisions.

Panoche identifies no procedural disadvantage it suffered in going forward with the arbitration as scheduled. Because Panoche failed to meet the "sufficient cause" prong under subdivision (a)(5), we need not decide whether its "rights" were "substantially prejudiced" by the arbitrators' ruling on the ripeness motion under the second prong of the statute.[17] (§ 1286.2, subd. (a)(5).)

**D. The Arbitrators' Award Must Be Confirmed Under Section 1287.4.**

Section 1286 makes clear, "If a petition or response under this chapter is duly served and filed, the court shall confirm the award as made . . . unless in accordance with this chapter it corrects the award and confirms it as corrected, vacates the award or dismisses the proceeding." That is, once a petition to vacate or correct is made, the court has only four options: dismiss the petition; vacate; correct the award and confirm; or confirm the award. Thus, in *Law Offices of David S. Karton v. Segreto* (2009) 176 Cal.App.4th 1, where the defendant petitioned to correct an initial arbitration award, and the trial court did not correct or vacate the award or dismiss the petition, the Court of Appeal ordered it to confirm the award. (*Id.* at pp. 8, 11; see also, *Louise Gardens of Encino Homeowners' Assn, Inc. v. Truck Ins. Exchange, Inc.* (2000) 82 Cal.App.4th 648,

---

[17] Suffice it to say, the "rights" referred to in the statute would appear to be the procedural rights available in the arbitration, and the "prejudice" referred to would also appear to be prejudice *in the arbitration* as a result of the refusal to postpone it. It is equally clear that "prejudice" under the statute must be attributable to the scheduling of the arbitration, not its mere pendency. Many of Panoche's claims of prejudice were claims of financial impacts extrinsic to the arbitration and unrelated to its timing, such as the downgrading of Panoche's credit rating by Standard & Poor's, the cost of conducting the arbitration, attorney's fees, and the like. We seriously question whether this is the type of "prejudice" to which the statute refers.

50

659 ["[I]f a timely petition to vacate had been filed, its denial would have directly and necessarily led to entry of a confirmation order . . . ," italics omitted].) Because Panoche's petition to vacate should have been denied, the arbitration award should have been confirmed and judgment entered in accordance with section 1287.4.

## IV.    DISPOSITION

The judgment is reversed. Panoche's motion to dismiss the appeal as moot is denied. Panoche's requests for judicial notice filed June 19, 2014 and November 26, 2014 are granted. PG&E's request for judicial notice filed January 4, 2016 is denied. The superior court's order vacating the arbitration award is reversed, as is the denial of PG&E's request to confirm the arbitration award. The superior court is ordered to confirm the arbitration award under section 1287.4, as requested by PG&E. PG&E shall recover its costs on appeal.

_____

Streeter, J.

We concur:

_____

Ruvolo, P.J.

_____

Reardon, J.

A140000/*Panoche Energy Center, LLC v. Pacific Gas & Electric Co.*

<u>Panoche Energy Center, LLC v. Pacific Gas & Electric Co. (A140000)</u>

Trial Court:    City & County of San Francisco Superior Court

Trial Judge:    Hon. Ernest H. Goldsmith

Counsel:

Cooley, Martin S. Schenker, Jeffrey M. Gutkin, Lori R. Mason for Appellant.

Manatt, Phelps & Phillips, David L. Huard, Andrew A. Bassak, Benjamin G. Shatz, Kevin P. Dwight for Respondent.