Filed 1/24/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MERCED IRRIGATION DISTRICT, | F072704 |
| Petitioner, | (Super. Ct. No. CV003013) |
| v. | |
| THE SUPERIOR COURT OF MERCED COUNTY, | **OPINION** |
| Respondent; | |
| HART HIGH-VOLTAGE APPARATUS REPAIR AND TESTING CO., INC., | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING; petition for writ of mandate, prohibition and/or other appropriate relief.  Donald J. Proietti, Judge.

Urrabazo Law, Donald Urrabazo, Arturo Padilla and Joon Song for Petitioner.

No appearance for Respondent.

Michel & Fackler, Michael D. Michel and Kate Morrow for Real Party in Interest.

-ooOoo-

Merced Irrigation District (MID) initiated this writ proceeding to challenge the trial court's conclusion that MID was not a "municipal corporation" for purpose of Public

Utilities Code section 10251.**1**  Under that provision, municipal corporations are authorized to recover all damages from any person who injures any facility or equipment of the municipal corporation through want of care.  The specific measure of damages authorized is the cost of repair or replacement, which includes administrative and other overhead expenses that are difficult to collect in an ordinary negligence action.  Here, MID contends the impact of limiting its recovery to the diminution in the value of the damaged equipment could be in the millions of dollars.

The trial court noted that the meaning of "municipal corporation" as used in section 10251 presented a controlling legal issue of first impression and an appellate resolution of that question may materially advance the conclusion of the litigation.  Accordingly, we issued an order to show cause.

The first question of statutory interpretation is whether the term "municipal corporation" is ambiguous.  We conclude an ambiguity exists because, historically, "municipal corporation" has been interpreted different ways in different contexts.  The second question of statutory interpretation is how to resolve the ambiguity.  Nothing in the statutory text or legislative history suggests the Legislature ever considered whether to extend the benefits of section 10251 to irrigation districts.  Furthermore, there are a variety of ways to describe the statutory purpose, some of which would be promoted by including irrigation districts and others which would not.  In the face of this uncertainty as to purpose, we return to the statutory text.  The term "municipal corporation" is usually understood in its strict or proper sense.  We adopt this meaning because it is the most common and, therefore, the best indicator of statutory intent.

Therefore, we conclude the term "municipal corporation" used in section 10251 does not include irrigation districts.  Accordingly, the trial court properly granted summary adjudication of MID's fourth cause of action under section 10251.

---

**1**     All unlabeled statutory references are to the Public Utilities Code.

We therefore deny the petition for writ of mandate.

## FACTS

Plaintiff MID is an irrigation district organized under the laws of the State of California with its principal place of business in Merced County. MID is not organized as a corporation, but contends it is a "municipal corporation" for purposes of section 10251.

Plaintiff Pacific Gas and Electric Company (PG&E) is a California corporation. PG&E provides gas and electrical service to about 15 million end users in northern and central California and is regulated by the California Public Utilities Commission.[2] In this case, MID contends that PG&E is a public utility or an "electrical corporation" for purposes of section 7952.[3]

MID's and PG&E's first amended complaint alleges that MID and PG&E "are the owners and operators of a transformer located at the Exchequer Dam on the Merced River" in Merced County (Exchequer transformer). The Exchequer transformer was an Allis-Chalmers 100 MVA Auto Transformer and was part of the power plant at the Exchequer reservoir.

Defendant HART High-Voltage Apparatus Repair and Testing Co., Inc. (HART) is a California corporation. In July 2009, HART submitted a quote to MID for servicing the Exchequer transformer. The work involved draining the transformer of insulating fluid, performing an internal inspection, removing and replacing five electro coolers, replacing a variety of gaskets, replacing other parts, refilling the transformer and performing tests. HART estimated the total price of this work at $122,415.

---

[2] *Panoche Energy Center, LLC v. Pacific Gas and Electric Company* (2016) 1 Cal.App.5th 68, 72.

[3] Section 7952 sets forth the measure of damages for damage done to a facility of an electrical corporation.

In September 2009, MID and HART signed Exchequer Contract 2009-08 pursuant to which MID agreed to the payment terms in HART's quotation and HART agreed to (1) perform all services outlined in its quotation and (2) maintain insurance coverage in accordance with MID's written requirements. The procedures HART agreed to perform included the following: "8) Verify all tools and materials have been removed from the transformer after internal inspection and repairs have been performed."

During HART's performance of the contract for servicing the Exchequer transformer, an incident occurred that gave rise to this litigation. MID and PG&E alleged that a HART employee dropped a washer into the Exchequer transformer.

HART asserted the Exchequer transformer was not physically damaged when the loose washer was dropped into it, but MID chose not to reenergize the transformer, allegedly out of concern that the transformer could be damaged if it was restarted with a loose washer inside it. MID responded to HART's view of damage by contending all parties agreed the transformer could not be reenergized with a loose metallic washer inside and, as such, the transformer was rendered unsuited for its intended purpose and had to be replaced.[4]

## PROCEEDINGS

In December 2012, MID and PG&E, as coplaintiffs, filed this lawsuit against HART in Merced County Superior Court. In August 2013, MID assigned all rights to its causes of action arising from the washer incident to PG&E, including the cause of action for breach of contract. In the assignment agreement, MID represented that it had received $1,032,000 pursuant to its insurance contract with the Joint Powers Insurance Authority to partially compensate it for damages or losses arising from the incident,

---

[4] MID's discovery responses stated "reenergizing with the washer inside could lead to an explosion and/or an oil spill which could contaminate the nearby Merced River." The parties' dispute about damages is immaterial to our determination of the meaning of the term "municipal corporation."

which funds it agreed to forward to PG&E. MID also represented: "It has been fully compensated by PG&E for any costs and/or expenses M[ID] has incurred arising from or related to the Incident." MID and PG&E also agreed they would be represented by the same law firm in the lawsuit against HART, with PG&E being solely responsible for the attorney fees and costs of that representation.

In August 2014, MID and PG&E filed a first amended complaint against HART, which is the operative pleading in this matter. The first amended complaint alleged four causes of action against HART: (1) negligence, (2) breach of contract, (3) violation of section 7952, and (4) violation of section 10251. There is no dispute about the causes of action being asserted, but MID has clarified that it does not claim recourse to section 7952 and PG&E does not claim recourse to section 10251.

*Motion for Summary Adjudication*

In June 2015, HART filed a motion for summary adjudication as to all of PG&E's causes of action and as to MID's causes of action for violations of sections 7952 and 10251. If the motion had been granted in full, the lawsuit would have been reduced to MID's causes of action for negligence and breach of contract.

HART's motion asserted that it was undisputed that MID was an irrigation district and was not a corporation or a municipal corporation. MID objected to these assertions, arguing they were legal conclusions and not facts. In addition, MID contended that it was a municipal corporation for purposes of section 10251.

HART's motion also asserted that MID was the sole owner of the Exchequer transformer at the time of the washer incident. HART supported this assertion by referring to various discovery responses and the June 25, 1964, power purchase agreement between MID and PG&E, which stated that MID "shall construct at its own risk and expense, and shall be the sole owner (under Federal Power Commission License) of the *project*."

5.

MID's opposition papers disputed HART's assertion that MID was the sole owner of the Exchequer transformer. MID argued that PG&E had ownership rights in the Exchequer transformer pursuant to the 1964 power purchase contract between MID and PG&E, which (1) entitled PG&E to all electricity generated by the project; (2) made PG&E responsible for all costs associated with maintaining and operating the Exchequer power plant; and (3) granted PG&E the right to enter upon, operate and maintain any part of the power plant in the event that MID failed to operate and maintain the project in accordance with the power purchase contract.

*Order Granting Summary Adjudication*

In September 2015, the trial court held a hearing on HART's motion for summary adjudication. Subsequently, the trial court filed a written order granting summary adjudication as to MID's third and fourth causes of action for violations of sections 7952 and 10251. The court noted that MID conceded it could not maintain an action under section 7952 because it was not a public utility.

As to MID's cause of action under section 10251, the court determined as a matter of law that MID was not a municipal corporation for purposes of section 10251. The court found the question presented was an issue of first impression.[5]

*The Writ Petition*

In November 2015, MID filed with this court a petition for writ of mandate, prohibition or other appropriate relief seeking review of the statutory interpretation that MID was not a municipal corporation for purposes of section 10251. MID supported its petition by filing a request for judicial notice of documents compiled by LRI History

---

[5] In addition, pursuant to Code of Civil Procedure section 166.1, the trial court stated it believed that its resolution of MID's cause of action under section 10251 involved a controlling question of law as to which there were substantial grounds for differences of opinion and appellate resolution of that question might materially advance the conclusion of the litigation.

LLC[6] relating to Statutes 1969, chapter 709 (Sen. Bill No. 939) and Statutes 1976, chapter 617 (Assem. Bill No. 3398).

Within two weeks, this court issued an order to show cause, directing HART to file a written return within 30 days and directing MID to file a reply within 30 days from the filing of HART's return. This court also stayed the trial scheduled in January 2016 and granted MID's request for judicial notice. Our consideration of HART's opposition to the request for judicial notice was deferred until consideration of the petition's merits.

## DISCUSSION

### I. BASIC LEGAL PRINCIPLES

#### A. Standard of Review

When reviewing the grant of a motion for summary adjudication, appellate courts independently consider and decide whether a triable issue of material fact exists and whether the moving party is entitled to summary adjudication as a matter of law. (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 631.)

#### B. Statutory Construction

Our Supreme Court's approach to the judicial interpretation of California statutes is well established. (*People v. Castillolopez* (2016) 63 Cal.4th 322, 329.) A court's "'role in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law.'" (*Ibid.*) Courts "'look first at the words themselves, giving them their usual and ordinary meaning'" because statutory language is generally the most reliable indicator of that intent. (*Ibid.*)

---

[6] The authentication of the records submitted with the documents comprising the legislative history stated that LRI History LLC was formerly Legislative Research Institute; Legislative Research, Incorporated; and Legislative Research & Intent LLC. (See *People v. McLernon* (2009) 174 Cal.App.4th 569, 576–577 [documents constituting part of legislative history for Pen. Code, § 1203.4 furnished by Legislative Research Incorporated].)

7.

### 1. *Statutory Language With a Plain Meaning*

When the statutory language, standing alone, is clear and unambiguous—that is, has only one reasonable construction—courts usually adopt the plain or literal meaning of that language. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)

The plain meaning of the words of a statute may be disregarded only when the application of their literal meaning would (1) produce absurd consequences that the Legislature clearly did not intend or (2) frustrate the manifest purposes that appear from the provisions of the legislation when considered as a whole in light of its legislative history. (*Faria v. San Jacinto Unified School Dist.* (1996) 50 Cal.App.4th 1939, 1945; see *Bob Jones University v. United States* (1983) 461 U.S. 574, 586 [a well-established canon of statutory construction provides that literal language should not defeat the plain purpose of the statute]; *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 567 [plain meaning approach to constitutional provision rejected to avoid absurdity].)

### 2. *Statutory Language That is Ambiguous*

Statutory language susceptible to more than one reasonable interpretation is regarded as ambiguous—that is, it has no plain meaning. (*Honchariw v. County of Stanislaus* (2013) 218 Cal.App.4th 1019, 1027.) Whether statutory language is ambiguous is a question of law subject to an independent determination on appeal. (*Wells Fargo Bank, N.A. v. 6354 Figarden General Partnership* (2015) 238 Cal.App.4th 370, 381 (*Wells Fargo*).)

When statutory language is susceptible to more than one reasonable interpretation, courts must (1) select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute and (2) avoid an interpretation that would lead to absurd consequences. (*Wells Fargo*, *supra*, 238 Cal.App.4th at p. 381.) The apparent intent of the Legislature is

determined by reading the ambiguous language in light of the statutory scheme rather than reading it in isolation. (*Lungren v. Deukmejian*, *supra*, 45 Cal.3d at p. 735.) Stated another way, the ambiguous language must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. (*Ibid*.) In addition, courts determine the apparent intent underlying ambiguous statutory language by evaluating a variety of extrinsic aids, including the ostensible objects to be achieved by the statute, the evils to be remedied, public policy, and the statute's legislative history. (*Wells Fargo*, *supra*, at p. 381.)

One difficulty in "'ascertain[ing] the intent of the Legislature'" (*People v. Castillolopez*, *supra*, 63 Cal.4th at p. 329) was described by "John Chipman Gray … more than a century ago: '[I]n almost all [cases of statutory interpretation], it is probable, and … in most of them it is perfectly evident, that the makers of the statutes had no real intention, one way or another, on the point in question; that if they had, they would have made their meaning clear; and that when the judges are professing to declare what the Legislature meant, they are, in truth, themselves legislating to fill up *casus omissi*.'" (Scalia & Garner, Reading Law: The Interpretation of Legal Texts (2012) 395.)[7]

This difficulty is present in this case. Nothing in the statutory text or legislative history demonstrates or suggests that the Legislature recognized the ambiguity of the term "municipal corporation" and held a particular view about how the ambiguity should be resolved or, alternatively, recognized a legislative consensus about its meaning could not be reached and, thus, resigned itself to using the ambiguous term and letting the judiciary resolve its meaning.

---

[7] Black's Law Dictionary (9th ed. 2009) defines the Latin phrase "*casus omissus*" as "[a] situation not provided for by a statute or contract, and therefore governed by caselaw or new judge-made law." (*Id*. at p. 247.)

II.     ANALYSIS OF THE MEANING OF SECTION 10251

    A.      Statutory Text

In accordance with the principle that a court's determination of the meaning of a statute begins with its actual words, we turn to the text of section 10251:

> "Any person who injures or destroys, through want of proper care, any necessary or useful facility or equipment of any *municipal corporation* is liable to the *municipal corporation* for all damages sustained thereby. The measure of damages to the facility or equipment injured or destroyed shall be the cost to repair or replace the property injured or destroyed including direct and allocated costs for labor, materials, supervision, supplies, tools, taxes, transportation, administrative and general expense and other indirect or overhead expenses, less credit, if any, for salvage. The specifying of the measure of damages for the facility or equipment shall not preclude the recovery of such other damages occasioned thereby as may be authorized by law." (See Stats. 1976, ch. 617, § 1, p. 1467, italics added.)

The Public Utilities Code does not define the term "municipal corporation" for purposes of section 10251 or, more generally, for purposes of the entire code. Thus, the Legislature did not explicitly address and resolve the question presented in this writ proceeding.[8]

    B.      Threshold Question:  Ambiguity

The parties' dispute over the meaning of the term "municipal corporation" used in section 10251 leads us to the threshold legal question of whether the term is ambiguous. (See *Wells Fargo*, *supra*, 238 Cal.App.4th at p. 381 [existence of statutory ambiguity is a question of law].)  For the reasons stated below, we conclude "municipal corporation" is an ambiguous term.

---

[8]     We note that, pursuant to section 203, the definitions of "corporation," "person," "electrical corporation," "local publicly owned electric utility" and "electric service provider" in the Public Utilities Act, sections 201 through 2282.5, do not explicitly apply to section 10251 because those definitions are in a different division of the Public Utilities Code.  (See §§ 204 [corporation], 205 [person], 206 [person, corporation], 218 [electrical corporation], 224.3 [local publicly owned electric utility], 394 [electric service provider].)

10.

*1.     Dictionary Definitions*

The California Supreme Court has stated that, when interpreting a statute, courts appropriately refer to dictionary definitions to ascertain the ordinary, usual meaning of a word.  (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122.)  For example, in *Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, we turned to Black's Law Dictionary for the meaning of words that were not defined by the statute.  (*Id*. at pp. 125–126.)  If one assumes that the Legislature was aware of the dictionary definition of a term when it passed the bill in question, then the edition of the dictionary to be consulted is the one current when the Legislature adopted section 10251 in 1976.  (See *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 570, fn. 4 [cite to the 1968 edition of Black's Law Dict.]; *Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th 1, 31.)

The edition of Black's Law Dictionary that was current when section 10251 was enacted defined "municipal corporation" as follows:

> "A public corporation, created by government for political purposes, and having subordinate and local powers of legislation.  [Citations.]  [¶] … [¶]

> "Cities, towns, and villages are municipal corporations proper.  [Citation.]  *On the other hand, such term in many instances does not extend so far as to include* counties; [citation]; or drainage districts; [citation]; or *irrigation districts*; *Crawford v. Imperial Irr. Dist.*, 200 Cal. 318, 253 P. 726, 729; or road districts; [citation]; or school districts; [citation]."  (Black's Law Dict. (4th rev. ed. 1968) pp. 1168–1169, italics added.)[9]

The relevant edition of Webster's Third New International Dictionary defined "municipal corporation" as "a political unit (as a town, city or borough) created and given

---

[9]     For purposes of comparison, a more recent edition defined "municipal corporation" as "[a] city, town, or other local political entity formed by charter from the state and having the autonomous authority to administer the state's local affairs; esp., a public corporation created for political purposes and endowed with political powers to be exercised for the public good in the administration of local civil government."  (Black's Law Dict. (9th ed. 2009) p. 1113, col. 2.)

11.

quasi-independent status by a nation, state, or other major governing authority and usu. endowed with powers of local self-government : a public corporation created by law to act as an agency of administration and local self-government." (Webster's 3d New Internat. Dict. (1976) p. 1487.)

### 2. *Historical Background*

In *Turlock Irrigation Dist. v. Hetrick* (1999) 71 Cal.App.4th 948 (*Hetrick*), this court addressed whether an irrigation district was empowered under the Public Utilities Code or the California Constitution to provide natural gas service to its customers and concluded it was not. (*Id.* at p. 950.) The irrigation district argued that it was a municipal corporation and, therefore, it had the powers granted to municipal corporations, including the power to own and operate any public utility. (*Ibid.*) Quoted below is *Hetrick*'s overview of irrigation districts and municipal corporations, which includes a discussion of various ways to interpret the term "municipal corporation." The cases cited were decided before section 10251 was enacted in 1976 and, consequently, help establish the wider historical circumstances that existed when section 10251 was enacted.[10]

> "We begin with a brief overview of statutory enactments enabling and regulating irrigation districts. In 1887, the California Legislature enacted the Wright Act, which gave irrigation districts the power to construct and maintain irrigation and drainage systems. The Wright-Bridgeford Act was passed 10 years later. The principal purpose of this legislation 'was to put water to agricultural use. Powers were adequate for securing a water supply and furnishing it to included lands.' (Henley, *The Evolution of Forms of Water Users Organizations in California* (1957) 45 Cal.L.Rev. 665, 668; Harding, *Background of California Water and Power Problems* (1950) 38 Cal.L.Rev. 547, 555.) In 1919, the Wright-Bridgeford Act was amended to permit irrigation districts to engage in the generation, distribution and sale of electricity. (Stats. 1919, ch. 370, § 1, p. 778.) In

---

[10]     The "wider historical circumstances" of a statute's enactment are relevant to ascertaining legislative intent. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 (*Dyna-Med*).)

1943, a new set of enabling statutes known as the Irrigation District Law, codified at Water Code section 20500 et. seq., was enacted.  This legislation granted irrigation districts authority to 'do any act necessary to furnish sufficient water in the district for any beneficial use.'  (Wat. Code, § 22075.)  In 1949, irrigation districts were granted power to acquire rock quarries and other projects for the preparation of sand and cement.  (Gov. Code, § 55500.)  These statutes remain in force today.

"A municipal corporation is a type of public corporation.  'Any municipal corporation may acquire, construct, own, operate, or lease any public utility.'  (Pub. Util. Code, § 10002.)  '"Public utility" as used in this article, means the supply of a municipal corporation alone or together with its inhabitants, or any portion thereof, with water, light, heat, power, sewage collection, treatment, or disposal for sanitary or drainage purposes, transportation of persons or property, means of communication, or means of promoting the public convenience.'  (Pub. Util. Code, § 10001.)  A municipal corporation may also 'establish, purchase, and operate public works to furnish its inhabitants with light, water, power, heat, transportation, or means of communication.'  (Cal. Const., art. XI, § 9.)

"Defining the exact legal nature of districts such as T[urlock Irrigation District] is problematic.  'What is a "municipal corporation," as that term is used in particular provisions of the constitution or in a statute, is often difficult to determine and there is considerable conflict in the decisions.  No general rule can be stated.'  (1 McQuillan, Municipal Corporations (3d ed. 1987) § 2.27, p. 188.)  'A "district" has been variously characterized by the courts as a "public corporation," "municipal corporation," "quasi-municipal public corporation," "state agency," "public agency," "agency or auxiliary of the state," "public corporation for municipal purposes," "quasi-municipal corporation," and other equally unenlightening descriptions.  A glance at the leading municipal text convinces one of the hopelessness of confining "districts," "public corporations," or "municipal corporations" within the neat box of a definition.'  (Hamilton, '*Districts'–What Are They?* (1967) 42 State Bar J. 119, fns. omitted.)  These 'instrumentalities of local government … defy simple definition or easy classification.'  (*Ibid*.)  Irrigation districts are sometimes referred to as municipal corporations, but it seems that they are not municipal corporations in the strict or proper sense of that term as it is usually understood, though they are public corporations for municipal purposes.  (*Whiteman v. Irrigation District* (1922) 60 Cal.App. 234, 237 [212 P. 706].)  They have also been public agencies in the nature of municipal corporations.  (*Water Users etc. Assn. v. Railroad Com.* (1922) 188 Cal. 437, 443 [205 P. 682], overruled on other grounds by *Los Angeles*

13.

*Met. Transit Authority v. Public Util. Com.* (1963) 59 Cal.2d 863 [31 Cal.Rptr. 463, 382 P.2d 583].) And authorities dealing with municipal corporations have been cited and applied in an irrigation district case on the ground that the similarity between the two is so close that the same general principles should be applicable. (*La Mesa etc. Irr. Dist. v. Halley* (1925) 197 Cal. 50, 60–61 [239 P. 719].) 'An irrigation district has been held to be a municipal corporation within the meaning of some provisions of the state constitution or statutes, but not within another provision.' (1 McQuillan, Municipal Corporations, *supra,* § 2.27a, p. 190, fns. omitted.)" (*Hetrick*, *supra*, 71 Cal.App.4th at pp. 951–952.)

The foregoing discussion of the uncertainty surrounding the meaning of the term "municipal corporation" leads us to conclude that the term is ambiguous.[11] Stated another way, "municipal corporation" is reasonably susceptible to multiple interpretations, some of which might include or exclude a particular irrigation district.

### 3. Possible Reasonable Interpretations

As the foundation for our analysis of the interpretations presented by the parties, we recognize three basic ways to reasonably interpret section 10251's term "municipal corporation":

One: Strictly, so that it *never* includes an irrigation district. (See *Hetrick*, *supra*, 71 Cal.App.4th at p. 952 [irrigation districts are not municipal corporations in the strict or proper sense of that term].)

Two: Broadly, so that it always includes all irrigation districts. (See *Rock Creek Water Dist. v. County of Calaveras* (1946) 29 Cal.2d 7, 10 [under policy protecting county's property tax base, "the [constitutional] term municipal corporation must be given a broad meaning unrestrained by the strict technical sense of the term"; irrigation district fell within term municipal corporation].)

Third: Flexibly, so that it is possible for an irrigation district to qualify as a "municipal corporation" when certain factors relating to the underlying purpose of the statute are present.

---

**11** One consequence of our legal conclusion that section 10251 is ambiguous is the rejection of one of the grounds raised in HART's opposition to MID's request for judicial notice of legislative history. HART contended judicial notice of legislative history was improper and unnecessary when the statute is unambiguous.

14.

The third possibility, unlike the first two, is not a single interpretation. Instead, it covers a range of interpretations falling between the first (i.e., strict) and the second (i.e. broad) interpretation. The range exists because of the variety of factors that could be held to be either (1) essential or (2) deserving of some weight in determining whether a particular irrigation district was a municipal corporation entitled to recover the additional damages allowed under section 10251. For instance, one could interpret "municipal corporation" to include an irrigation district if and only if the irrigation district proves (1) the district's damaged facility or equipment was used to provide services ordinarily provided by a public utility and (2) such services had a municipal character—that is, were provided by the district to its inhabitants.[12]

The polar opposite interpretations, and the range of interpretations in between, gives each party two ways to prevail. HART could win by convincing this court that, for purposes of section 10251, irrigation districts (1) are never municipal corporations or (2) are municipal corporations only if they satisfy a set of conditions that MID has not met. Conversely, MID could win a reversal by convincing us that, for purposes of section 10251, irrigation districts (1) are always municipal corporations or (2) are municipal corporations when certain factors are present and, at a minimum, there are triable issues of fact about the presence of those factors in this case.

C.      Contentions of the Parties

1.      *MID's Interpretation*

MID has not urged us to adopt the broadest interpretation of municipal corporation and conclude that irrigation districts are *always* municipal corporations for purposes of

---

**12**      A reason for adopting a test using the term "its inhabitants" is that the term appears in the constitutional provision granting powers to municipal corporations and in the statutory definition of public utility. (Cal. Const., art. XI, § 9 [public works in municipalities, operation or regulation]; § 10001 [definition of public utility]; see *Metropolitan Water Dist. v. Superior Court* (1934) 2 Cal.2d 4, 7 ["supplying of water to the inhabitants of a city is deemed to be a legitimate municipal affair"].)

section 10251. Instead, MID argues it is a municipal corporation based on three undisputed facts. First, MID is an irrigation district. Second, MID exercised its statutory authority to acquire and operate a plant for the generation and sale of electric power. (See Wat. Code, § 22115.) Third, the property for which it seeks damages under section 10251 was used to transmit the electric power generated by its plant.

In summary, MID has argued for a broad, but not the broadest, interpretation of section 10251. In essence, MID contends an irrigation district is a municipal corporation for purposes of section 10251 if it generates and sells electricity.[13]

### 2. HART's Interpretation

HART argues for the strict construction of the term "municipal corporation." In HART's view, "the Legislature has identified irrigation districts as state agencies and not municipal corporations for all purposes, precluding the selective enforcement of the statutory law." HART relied on Water Code section 20570, which states that irrigation districts are state agencies.[14] In addition, HART contends that MID's discovery responses establish that MID is not a corporation of any kind.

In response to MID's contentions, HART states that MID "has not advanced any principled argument as to why it should be considered a municipal corporation for some

---

**13**    At oral argument, counsel for MID acknowledged that MID was not, technically speaking, a municipal corporation, but it should be considered a municipal corporation for purposes of section 10251.

**14**    HART's argument that Water Code section 20570 demonstrates the Legislature has identified irrigation districts as "not municipal corporations *for all purposes*" (italics added) is hyperbole, unsupported by any statutory text or legislative history demonstrating, directly or by inference, the Legislature intended Water Code section 20570 to control situations arising outside the provisions of the Irrigation District Law. For instance, HART has presented nothing showing this section was adopted to overturn several cases holding that irrigation districts were municipal corporations in contexts not governed by the Water Code.

16.

purposes but not others, or how the courts should decide when the District is a municipal corporation and when it is not."

D.  Statutory Context

The meaning of an ambiguous statutory phrase is not determined from a single sentence.  (*Lungren v. Deukmejian*, *supra*, 45 Cal.3d at p. 735.)  Rather, the meaning is determined by reading the ambiguous language in light of the statutory scheme and other statutory provisions relating to the same subject matter.  (*Ibid.*)  Accordingly, this part of the opinion describes (1) other statutes relating to damages; (2) section 7952, which addresses the damages an electrical corporation may recover for damages to its facilities or equipment; (3) Water Code provisions relating to irrigation districts in general or to MID in particular; and (4) other provisions of the Public Utilities Code.

*1.  General Statutory Provisions Relating to Damages*

Section 10251 addresses the recovery of damages.  The topic of damages for breach of contract and negligence is addressed in general provisions of the Civil Code. For instance, Civil Code section 3300 addresses contract damages and provides:

> "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

A limitation on the recovery of contract damages is set forth in Civil Code section 3301, which provides:  "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin."

Civil Code section 3333 addresses the recovery of damages for various types of torts:

> "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

17.

MID contends the foregoing provisions are relevant to interpreting section 10251 because the Legislature adopted section 7952 and then added section 10251 because the remedies provided by the common law and Civil Code sections were insufficient for injuries to property used for utility purposes.

###### 2. *Specific Provision Relating to Damages to Utilities—Section 7952*

Section 7952 "[s]ets forth the measure of damages for damage done to a facility of a telegraph, telephone, electric or gas corporation." (Legis. Counsel's Dig., Sen. Bill No. 939, 2 Stats. 1969 (Reg. Sess.) Summary Dig., p. 102.)[15] Prior to the 1969 amendment, section 7952 referred to "all damages," but did not define "damages" or otherwise specify particular items that could be recovered. In 1969, section 7952 was amended to state in part:

> "Any person who injures or destroys, through want of proper care, any necessary or useful facility or equipment of any telegraph, telephone, electrical, or gas corporation, is liable to the corporation for all damages sustained thereby. The *measure of damages* to the facility or equipment injured or destroyed shall be the *cost to repair or replace the property injured or destroyed* including direct and allocated costs for labor, materials, supervision, supplies, tools, taxes, transportation, *administrative and general expense* and *other indirect or overhead expenses*, less credit, if any, for salvage, as determined by such telegraph, telephone, electrical or gas corporations in conformity with a system of accounts established by the commission. The specifying of the measure of damages for the facility or equipment shall not preclude the recovery of such other damages occasioned thereby as may be authorized by law." (Stats. 1969, ch. 709, § 1, pp. 1389–1390, italics added.)

An unitemized document in the Governor's chapter bill file on Senate Bill No. 939 (1969 Reg. Sess.)[16] explained the reasons for amending section 7952 as follows:

---

**15** The summary digests of Legislative Counsel are properly considered by an appellate court without the need for judicial notice because the digests are published. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1129, fn. 4.)

**16** A declaration of the research director at LRI History LLC stated the document was a true and correct copy obtained from the public source indicated.

18.

"The Public Utilities Code presently establishes liability for 'all damage' to equipment owned by utilities, but does not define 'damages'. Such definition is necessary because of the direct interest the consuming public has in the recovery of this type [of] damage.

"Since the service is so highly specialized, the utilities can most economically and most effectively restore service to the public by repairing the damage to their own system. In repairing their own systems, utilities incur certain indirect costs. [¶] … [¶]

"If the utility, and more importantly, the consuming public, is to be made whole for the cost of repairing such damage, the party causing the damage must be required to pay not only the direct cost, but also the indirect cost of making these repairs. Any indirect costs not recovered from the wrong doer must be recovered through rates charged to utility customers.

"The absence of a statutory definition of damages to utility property where the repair work is performed by utility forces has resulted in a great deal of litigation which could be avoided.

"Justice, equity and common sense require this amendment in order to define the measure of damage to a utility's property and to prevent needless and expensive litigation which must be paid for by the utility and therefore, the consuming public."

The enrolled bill memorandum to the Governor, dated August 7, 1969, for Senate Bill No. 939 stated, "The bill was sponsored by Southern California Edison Company. It is intended to more clearly define 'damages' by including indirect charges." The text and legislative history of section 7952 is relevant in this proceeding because that statute served as the pattern for section 10251.

> 3.    *Water Code Provisions Relating to Irrigation Districts*

Water Code section 20500 states that the division containing Water Code sections 20500 through 29978 "shall be known and may be cited as the Irrigation District Law." Water Code section 20560 provides that irrigation districts, "regardless of the date of formation, are subject to the provisions of this division." Water Code section 20570

19.

provides: "It is reaffirmed that [irrigation] districts are state agencies formed and existing for governmental purposes."**17** (See Wat. Code, § 20513 [definition of "district"].)

Water Code sections 22980, 22981 and 22982 apply to MID and two other irrigation districts. Water Code section 22981 grants specified powers to MID and the other districts. It states that the powers for the construction of facilities conferred by divisions of the Streets and Highways Code "upon boards, officers, and agents of *cities* shall be exercised by the board, officers, and agents of [MID], respectively." (Wat. Code, § 22981, subd. (e)(3), italics added.) MID contends this provision, which is more specific than Water Code section 20570, demonstrates that MID functions like a city or local governmental entity, not a state agency.

Water Code section 22115 sets forth the general powers granted to irrigation districts, including the acquisition, operation and control of plants for the generation, transmission, distribution, and sale of electric power. Water Code section 22116 states that provisions of the Irrigation District Law shall be "construed and enforced as to apply to electric power." Water Code section 22075 states that an irrigation district "may do any act necessary to furnish sufficient water in the district for any beneficial use." MID contends that the authorization to do any act necessary applies, as a result of Water Code section 22116, to an irrigation district's electric operations and authorizes it to recover the broader measure of damages.

---

**17** Water Code section 20570 does not apply in all contexts. In *Basurto v. Imperial Irrigation Dist.* (2012) 211 Cal.App.4th 866, the court considered Government Code section 11410.30, which defines "local agency" to include "a county, city, [or] district" and concluded an irrigation district was a "district" and therefore a local agency under for purposes of California's Administrative Procedures Act. (*Id*. at p. 881.) The court noted that "other courts have recognized that water districts are not considered state agencies for all purposes. [Citation.]" (*Id*. at p. 882.)

20.

### 4.    *Other Provisions in the Public Utilities Code*

As a further response to HART's argument that the Legislature established irrigation districts as state agencies and not municipal bodies, MID cites sections 394.6 and 9607, subdivision (h) because those provisions refer specifically to MID.

Section 394.6 provides a general definition of "service territory of a local publicly owned electric utility"[18] and then states:  "Furthermore, for purposes of this article, the boundaries of the *Merced Irrigation District* shall be as those boundaries existed on December 20, 1995, together with the territory of the Castle Air Force Base, which was located outside of the district on that date."  (Italics added.)  MID cites this provision as further demonstrating that its electrical operations are similar to the operations conducted by a municipal corporation, not a state agency.

Section 9607 was enacted in 2000 and expressly states that "[t]he intent of this section is to avoid cost-shifting to customers of an electrical corporation resulting from the transfer of distribution services from an electrical corporation to an irrigation district."  (§ 9607, subd. (a).)  MID has cited subdivision (h) of section 9607 because that provision specifically mentions MID:

> "The provisions of this section shall not apply to (1) a cumulative 90 megawatts of load served by the *Merced Irrigation District* that is located

---

**18**    The phrase "[l]ocal publicly owned electric utility" is defined by section 224.3 as "[1] a municipality or *municipal corporation* operating as a 'public utility' *furnishing electric service* as provided in Section 10001, [2] a municipal utility district furnishing electric service formed pursuant to Division 6 (commencing with Section 11501), a public utility district furnishing electric services formed pursuant to the Public Utility District Act set forth in Division 7 (commencing with Section 15501), [4] an *irrigation district furnishing electric services* formed pursuant to the Irrigation District Law set forth in Division 11 (commencing with Section 20500) of the Water Code, or [5] a joint powers authority that includes one or more of these agencies and that owns generation or transmission facilities, or furnishes electric services over its own or its member's electric distribution system."  (Italics added.)  This provision demonstrates the Legislature is capable of referring to both municipal corporations and irrigation districts in the same provision when it intends to cover both types of entities.

within the boundaries of *Merced Irrigation District*, as those boundaries existed on December 20, 1995, together with the territory of Castle Air Force Base which was located outside the District on that date, or (2) electric load served by the District which was not previously served by an electric corporation that is located within the boundaries of *Merced Irrigation District*, as those boundaries existed on December 20, 1995, together with the territory of Castle Air Force Base which was located outside the District on that date." (Italics added.)

In MID's view, this provision also demonstrates that its electric operations are local in character and, thus, supports its argument that it should be deemed a municipal corporation rather than a state agency for purposes of section 10251.

E. <u>Section 10251's Legislative History</u>

When determining the meaning of ambiguous statutory language, courts may examine the statute's legislative history, which may provide insight into (1) the ostensible objects to be achieved by the statute, such as remedying a particular evil and (2) the public policy underlying the statute. (*Wells Fargo*, *supra*, 238 Cal.App.4th at p. 381.)

*1. Author's Letter to the Governor*

HART's opposition to MID's request for judicial notice of the legislative history compiled by LRI History LLC for section 10251 contends that documents reflecting the opinions of individuals, even the author of the bill, should not be considered. (See *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1401 [material showing the motive or understanding of an individual legislator, including the bill's author, generally is not considered].) Despite this general approach, we note that letters from the author of a bill to the Governor are quoted occasionally by the California Supreme Court. (E.g., *Property Reserve, Inc. v. Superior Court* (2016) 1 Cal.5th 151, 181, fn. 9; *In re Greg F.* (2012) 55 Cal.4th 393, 419.) Consequently, we will consider the author's letter to the Governor for what it is worth. (*Drouet v. Superior Court* (2003) 31 Cal.4th 583, 598, fn. 4 [very little value to letter from bill's author that merely recounts author's views].)

22.

Assemblyman Dixon, the author of Assembly Bill No. 3398, sent the Governor a letter dated August 16, 1976, stating:

> "Under current law municipally owned utilities are allowed to recover only for direct expenses such as labor, materials, etc. when damage occurs to their property. Privately owned utilities are allowed to recover for administrative and general expenses and other indirect or overhead expenses. [¶] Los Angeles Department of Water and Power suffers damage to their equipment of approximately $455,000 per year, with administrative and general expenses usually amounting to 10 percent of the damages, and $45,000 per year. [¶] I respectfully request your favorable action on AB 3398."

2.      *Summary of Other Materials*

Other materials in the legislative history for Assembly Bill No. 3398 show that it was sponsored by the City of Los Angeles. Correspondence from the City of Los Angeles shows it sponsored the bill because "recent judicial attacks on the Department [of Water and Power's] bills for damages have been successful on the theory that the Department, not being included [as a utility] in Section 7952, is not therefore entitled to recover its administrative and general expenses." The bill was supported by the Association of California Water Agencies and the California Trial Lawyers Association.

The question why section 10251 was adopted rather than revising section 7952 to include municipal corporations was addressed by materials in the author's file. Assemblyman Dixon asked the Legislative Counsel of California whether municipal corporations could be included in the coverage of section 7952 and, if not, where an amendment could be placed to alleviate their problem. In a letter responding to these questions, a deputy legislative counsel stated section 7952 was part of a body of law generally relating to privately owned public utilities and, consequently, it was not appropriate to include municipal corporations in that section. The letter recommended adding a new provision "to Division 5 (commencing with Section 10001) of the Public Utilities Code, which relates to utilities owned by municipal corporations."

23.

An analysis for the Assembly Judiciary Committee for a May 24, 1976, hearing included the following comment: "The principal change carried out by this bill is the allowance of administrative and other indirect costs. Under existing law, only direct costs can be recovered as damages. The danger in allowing indirect costs to be recovered lies in the difficulty in measuring such costs."

Our summary of the materials in the legislative history for section 10251 concludes by identifying some subjects not mentioned in those materials. Specifically, they make no reference to (1) districts in general, (2) any specific type of district, including irrigation districts, or (3) the customers, consumers or end users of the services provided by the municipal corporation.

F.      Analysis of Meaning

When resolving the meaning of ambiguous statutory language, courts (1) select the construction that most closely comports with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute and (2) avoid interpretations that lead to absurd consequences. (*Wells Fargo*, *supra*, 238 Cal.App.4th at p. 381.)

1.      *Apparent Intent of the Legislature—Explicit and Implicit*

The materials in the legislative history presented by MID do not explicitly address, one way or the other, whether irrigation districts should be entitled to recover damages under section 10251. Furthermore, we have located no statements in those materials that imply irrigation districts or any other type of district should be regarded as a municipal corporation or should benefit from the broader measure of damages set forth in section 10251. As a result, neither the text nor the legislative history shows that the Legislature considered the particular question presented in this writ proceeding, much less developed a common understanding about how that question should be answered.

In sum, the inquiry into "apparent intent" does not take us very far because no intent relating to the question before us is apparent. Consequently, we proceed to the concept of legislative *purpose* and consider what inferences about purpose should be drawn from the silence of the materials constituting the legislative history for section 10251.

### 2. *Purpose*

When it appears the Legislature never considered the particular question raised in litigation, courts resort to analyzing the general purpose of the statute with the goal of adopting the construction that best effectuates the purpose of the law. (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 888.) For example, the statute creating standing for taxpayer lawsuits is construed broadly to promote the statute's remedial purpose. (*Thompson v. City of Petaluma* (2014) 231 Cal.App.4th 101, 105 [nonresident taxpayer had standing under Code Civ. Proc., § 526a to sue city].)

The difficulty in analyzing the purpose of section 10251 is identifying a purpose that has a bearing on whether to interpret "municipal corporation" strictly or broadly. For example, it is unclear whether the purpose of section 10251 was to extend the protections of section 7952 to *all* governmental entities that provide utility services. Viewed narrowly, one could conclude the purpose of section 10251 was to benefit cities, such as its sponsor—the City of Los Angeles. Viewed from an alternate perspective, one could conclude that the statutory purpose was to protect customers of utility services from paying part of the cost of injuries inflicted by third parties on facilities and equipment.

We conclude that the purpose of section 10251, at least insofar as it relates to the proper scope of the term "municipal corporation," cannot be identified by referring to the text or legislative history for section 10251. There are various ways to characterize that purpose and the characterization chosen will influence, if not determine, the statutory construction adopted. In the face of this uncertainty, we turn back to the words of the

statute and adopt the most commonly used meaning of the term "municipal corporation." The term is usually understood in its strict or proper sense, which excludes irrigation districts. (*Hetrick*, *supra*, 71 Cal.App.4th at p. 952.)

The approach of adopting the most commonly used meaning of the ambiguous term prevents us from undertaking legislative functions. For instance, we need not invent or find a purpose and then adopt an interpretation to further that purpose. Also, we avoid the question of whether there is a gap in the statute and, if a gap exists, rewriting the statute to fill it in some manner. For example, we would have to determine whether harm to *any* equipment and facilities of *any* irrigation district is covered by section 10251 or whether the coverage is limited to equipment and facilities used by irrigation districts to provide utility services like the utility services provided by municipalities. The text of section 10251 refers to "*any* necessary or useful facility or equipment of *any* municipal corporation" (italics added) and, thus, does not appear to limit the damages to injuries done to facilities and equipment *used in providing utility services*, such as electricity. Thus, to limit coverage to damage to facilities and equipment involved in providing utility services, we would have to extrapolate a purpose to protect consumers of utility services by referring to section 7952 and then assume that consumer-protection purpose also underlies section 10251. The foregoing illustrates (1) the details that must be dealt with to either fill a statutory gap or expand the statutory coverage and (2) the complications that arise in such an endeavor. These complications lead us to conclude that the better course is judicial restraint and the adoption of the most commonly used meaning of the term "municipal corporation." The words of the Legislature are the best indicators of the statutory intent or purpose and no better indicator has manifest itself in this case.

Accordingly, the trial court correctly concluded that MID was not a municipal corporation for purposes of section 10251. Therefore, we uphold the order granting

26.

HART's motion for summary adjudication as to MID's cause of action under section 10251.

## DISPOSITION

The petition for writ of mandate is denied.  The real party in interest shall recover its costs in this writ proceeding.

_____

FRANSON, J.

WE CONCUR:


_____

KANE, Acting P.J.


_____

SMITH, J.